**GLENBROOK ROAD ASSOCIATION, et al., Petitioners,**

v.

**DISTRICT OF COLUMBIA BOARD OF ZONING ADJUSTMENT, Respondent,**

**and**

**The American University, Intervenor.**

**FORT GAINES CITIZENS ASSOCIATION, et al., Petitioners,**

v.

**DISTRICT OF COLUMBIA BOARD OF ZONING ADJUSTMENT, Respondent,**

**and**

**The American University, Intervenor.**

**Nos. 90–217, 90–335.**

District of Columbia Court of Appeals.

Argued April 18, 1991.
Decided March 17, 1992.

---

Richard B. Nettler, Washington, D.C., for petitioners Glenbrook Road Ass'n, et al.

Anne Spielberg, with whom Eric R. Glitzenstein, Washington, D.C., was on the brief, for petitioners Fort Gaines Citizens Ass'n, et al.

Herbert O. Reid, Sr., Corp. Counsel at the time, and Charles L. Reischel, Deputy Corp. Counsel, Washington, D.C., filed a memorandum in lieu of brief on behalf of respondent.

Whayne S. Quin, with whom Louis P. Robbins and Edward L. Donohue, Washington, D.C., were on the brief, for intervenors.

Andrea C. Ferster, Washington, D.C., filed a brief for amicus curiae, Common Cause/D.C., in No. 90–335.

Before SCHWELB and WAGNER, Associate Judges, and PRYOR, Senior Judge.

SCHWELB, Associate Judge:

This case requires us to consider disputes between American University and some of its neighbors regarding the University's plans to construct a more spacious law school and to alter the boundaries of the University's campus. Before us are separate petitions by two community organizations for review of a February 21, 1990 order of the District of Columbia Board of Zoning Adjustment (BZA or the Board) granting special exceptions from the Zoning Regulations to American University (the University) for its plan of campus development during the years 1989 to 2000. In No. 90–335, petitioner Fort Gaines Citizens Association (FGCA) challenges the BZA's order approving the University's plan for a new site for the Washington College of Law. In No. 90–217, petitioner Glenbrook Road Association (GRA) asks us to set aside that portion of the Board's order which would allow the University to amend its campus boundary to delete a parcel of land (known as Parcel B) which has served as a natural buffer between the sights and sounds of the University and the neighboring residences located on Glenbrook Road.

Both the FGCA and the GRA contend that the Board failed to make findings on certain material contested issues of fact, as required by the District of Columbia Administrative Procedure Act, D.C.Code § 1–1509(e) (1987), and that some of the critical findings which the Board did make are not supported by substantial evidence in the record. Each association claims that the BZA failed adequately to explain the standard which it applied in ruling on the petitioners' various objections. Both petitioners contend that the Board failed to accord the required "great weight" to the views of Advisory Neighborhood Commissions (ANC's) which supported their respective positions; the FGCA also complains that the Board did not address the view of the Office of Planning (OP). The FGCA maintains that the BZA failed to comply with the District of Columbia Environmental Policy Act of 1989 (DCEPA), D.C.Code §§ 6–981 to –990 (1990 Supp.). Finally, both petitioners contend that the Board erred in not permitting them to cross-examine the University's rebuttal witnesses.

Perfection is a rare commodity. In spite of the BZA's extensive, painstaking, and in some respect excellent findings, we conclude that the Board made a number of errors or omissions in this large and complex case. In particular, we hold that the Board erred in denying petitioners the right to cross-examine the University's rebuttal witnesses. This error was compounded by the manner in which the ruling was made—the presiding officer asked counsel for GRA whether he was "kidding" when he sought to cross-examine a rebuttal witness, and she then at least intimated that the Board never allows cross-examination at this stage of a case. Nevertheless, we find that these errors were harmless. Accordingly, we affirm.

## I

### THE FACTS

*A. Background Information.*

The campus of American University occupies two areas of land in northwest Washington. Most of the University's buildings are located on a parcel bounded by Van Ness Street on the north, Rockwood Parkway and Newark Street on the south, University Avenue and 46th Street on the west, and Nebraska and Massachusetts Avenues east of Ward Circle on the east. This area is zoned R–5–A, a high-density classification which permits multiple-unit residential land use. The second area is bounded by Yuma Street on the north, Warren Street on the south, 42nd Street on the west, and Nebraska Avenue and Tenley Circle on the east. This part of the campus is zoned R–1–B, and restricted to low-density residential land use.

The District of Columbia Zoning Regulations do not allow the location of colleges and universities in residentially zoned districts as a matter of right. *Levy v. District of Columbia Bd. of Zoning Adjustment*, 570 A.2d 739, 741 (D.C.1990). Rather, the Board may grant "special ex- ceptions," which will permit university uses in residential districts, if the Board determines that "those special exceptions will be in harmony with the general purpose and intent of the Zoning Regulations and Maps and will not tend to affect adversely the use of the neighboring property...." 11 DCMR § 3108.1 (1987). "[T]he burden is on the applicant to demonstrate that the proposed exception satisfies the requirements of the regulation under which it is sought." *Dupont Circle Citizens Ass'n v. District of Columbia Bd. of Zoning Adjustment*, 390 A.2d 1009, 1012–13 (D.C. 1978).

Before approving such a special exception, the Board must find that the proposed use is not likely to become objectionable to neighboring property owners because of noise, traffic, the number of users, or other such conditions, *see* 11 DCMR § 210.2 (1987), and will not unreasonably expand the campus into improved low-density districts. *Id.* at § 210.3; *see also Levy, supra,* 570 A.2d at 742. The Board is also required to apply these regulatory criteria to its consideration of a university's development plan for its campus. *See Citizens Ass'n of Georgetown v. District of Columbia Bd. of Zoning Adjustment,* 403 A.2d 737, 738 (D.C.1979); 11 DCMR §§ 210.4, 507.3–.8 (1987).

*B. The Campus Plan.*

The University developed its first Campus Plan in 1974. On May 22, 1987, at the direction of the BZA, the University submitted an updated Campus Plan for the years 1987 to 2000. As part of this plan, the University proposed to construct a number of new buildings, including a facility which would occupy 150,000 square feet and would be used to house the Washington College of Law. The University proposed that the new law school be located on the site of the existing Cassell Center on Massachusetts Avenue, N.W.[1]

---

1. According to the dean of the law school, the need for a new facility was compelling. He testified that Washington College of Law is highly rated nationally in terms of faculty, scholarship, and entering class, but that it is in the bottom two percent of law schools in terms of space.

The BZA held four public hearings on the University's proposals. Several neighborhood organizations, including Neighbors for a Livable Community (NLC), presented testimony in opposition to the plan. The residents' primary objection was to the proposed new site for the law school. On May 9, 1988, following the conclusion of these public hearings, the BZA directed the University to negotiate with the organizations and individuals opposed to the plan, and to respond to certain proposals submitted by NLC.

In response to the Board's directive, the University appointed a new "team," whose mission was to find a way to meet the University's needs while accommodating the legitimate concerns of neighborhood residents. Representatives of the University met frequently with representatives of the NLC and with other interested organizations and neighbors. All local residents were invited to these meetings and were given the opportunity to voice their concerns and objections to the proposed Campus Plan and to make suggestions and recommendations to the University regarding possible modifications. As a result of these contacts and negotiations, the University was able to formulate a new plan (the 1989 plan) and to secure the support of the NLC and of a number of other individuals who and organizations which had opposed the 1987 plan. Several of these organizations entered into a detailed agreement with the University, which was ultimately incorporated by the BZA into its Order approving the Campus Plan. There was testimony before the Board that the neighborhood organizations were united in favor of most of the plan until shortly before the agreement was signed.

In an effort to accommodate the neighbors' suggestions and to win their support, the University made significant concessions with respect to various parts of its proposal. Specifically, the University agreed to reductions in the size, height and design of the Washington College of Law. The law school would now occupy 130,000 square feet, instead of 150,000 as previously contemplated. The third floor was to be eliminated, and the activities originally planned for that floor were now to be conducted in windowless underground space. The University's architect testified that, when viewed from the Fort Gaines neighborhood, the law school would appear to be only one and a half stories tall, and that much of the building would be almost entirely invisible from that location because of its reduced height and because of a fence that was to be constructed. The proposed hours of operation of the facility were substantially decreased, and the University agreed to a cap on the number of students, faculty, and staff who would be using the facility on a daily basis.

The University also made a number of additional concessions designed to alleviate traffic and parking problems, and to provide a visual barrier between the campus and neighboring residential areas. According to testimony presented to the Board, the new law school would be further than the present Cassell Center from the University's property line, and thus from the Fort Gaines neighborhood. Moreover, the academic dean of the University explained that substantially fewer persons would be using the facility each day than the number who had in the past used the Cassell Center, when it housed a variety of activities.

In choosing a proposed site for the law school, the University and representatives of its neighbors reviewed all potential locations on the campus and concluded that there were eight locations which at least merited consideration. Site evaluation criteria were developed to aid in determining which of the eight sites would be most beneficial both to the University and to the neighboring communities. At the conclusion of the site selection analysis, site 4 (the site of the existing Cassell Center) and a portion of site 3 (an undeveloped wooded area of land) were selected as the most suitable locations for the University's new law school; site 3 was to be used for a parking lot. The University's architect testified that the Cassell Center was the best site both for the University and for the residents; indeed, he described it as the "only" suitable site.

The FGCA maintains that the evaluation criteria improperly focused, almost exclusively, on the University's needs, rather

than on the community's. The record discloses, however, that the University considered not only its own concerns but also those of the affected neighbors. Specifically, the University and the representatives of the neighbors developed a sophisticated "Site Evaluation Matrix" which assessed each potential site in terms of a number of criteria. Among the criteria in the matrix were several "Context Impacts," including "Neighborhood Building Environment" and "Neighborhood Improvement Opportunities." These titles reflected a design on the part of those participating in the site selection process to "allow for siting of the building in a way that it does not detract from existing environment" and that "the building should fit with the site."

With respect to the amendment of the Campus Plan to eliminate Parcel B, the University developed a three-phased plan to address the concerns of affected neighbors. The University proposed to sell Parcel B, which it regarded as useless to it in carrying out University functions, and to create a new buffer zone to protect residential areas adjacent to Parcel B.[2] Phase I, which included the erection of a nine-foot wooden fence along the perimeter of the campus and the planting of a number of trees and shrubs, was scheduled to begin within one year after the BZA approved the Campus Plan. Phase II provided for the additional planting of trees on the perimeter, and was to be put into effect if any of six existing tulip poplar trees[3] were removed or destroyed in the development of Parcel B. Finally, Phase III provided for the planting of more trees and shrubs, but only if the University were to construct an addition to its Arts Center.

C. *The Views of the Advisory Neighborhood Commissions.*

1. *Selection of a site for the law school.*

Advisory Neighborhood Commission (ANC) 3–E, whose jurisdiction includes the Fort Gaines area, opposed the proposed location for the new law school. The Commission contended that the proximity of site 4 to private homes in the Fort Gaines neighborhood, combined with the increase in the number of people who would use the facility, would have an adverse impact on the neighborhood. ANC 3–E also apprehended a potential increase in traffic and parking on adjacent residential streets. The Commission recommended that the law school be located instead on site 5, which is currently a parking lot on Nebraska Avenue.

2. *The Deletion of Parcel B.*

In a report dated October 13, 1989, ANC 3–D, which has jurisdiction of the area in which parcel B is located, approved most of the 1989 campus plan, but opposed the proposed amendment of the campus boundary. ANC 3–D maintained that the proposed amendment would leave an insufficient buffer between the University and the development that would take place on Parcel B, with adverse consequences for residents of the Glenbrook Road neighborhood. The Commission urged the Board to redraw the campus boundary to include and retain twelve existing mature trees which, in its view, were critical to the maintenance of an adequate buffer. Finally, ANC 3–D recommended that the contract purchaser of Parcel B be required to enter into a covenant with the adjoining homeowners which would require the purchaser to include a landscaping, grading, and sloping plan for this area.

D. *The Recommendations of the Office of Planning.*

As required by the Zoning Regulations, 11 DCMR § 210.6 (1987), the District of Columbia Office of Planning (OP) reviewed

---

2. At the time of the BZA hearings, Parcel B was under contract of sale, and a petition for rezoning from R–5–A to R–1–A was pending. We are advised that the sale has been completed, and that the application for rezoning has been approved. *See* Zoning Commission Order No. 663, 37 D.C.R. 4030 (1990).

3. Certain existing trees had been identified by petitioners as being essential to an adequate buffer.

the 1989 campus plan and filed written recommendations. Generally, OP recommended that the BZA approve the plan, subject to certain conditions. The Office initially stated, however, that it was "not convinced that the location [of the law school] is the most appropriate one," and voiced reservations regarding its construction at that site. The Office expressed the concern that the proposed law school building, which would occupy 130,000 square feet, would be closer than any other University facility to a large number of single family homes. OP was of the opinion that it might be possible to find an alternate site on the campus to accommodate the physical needs of the law school. The Office deferred its final recommendation, however, until after the completion of the public hearings. The record was left open for the purpose of receiving OP's final report.

In that report, submitted on November 5, 1989, OP provided no further information regarding its position on the law school. On December 6, 1989, the Office attempted to submit an additional report dated November 29, 1989. That submission, however, "[did] not include any new material related to this case, and is merely a reiteration of our July 5 report." The Board declined to accept this most recent document. There is no indication in the record, however, that OP ever withdrew or modified its initial reservations about the proposed site.

### E. The BZA Order.

On February 21, 1990, the BZA unanimously approved the University's 1989 campus plan. Its decision included ninety-four separate Findings of Fact, as well as unnumbered but reasonably extensive Conclusions of Law. The Board accepted the University's contention that site 4 was the only available location where an existing, unsightly facility could be replaced with a well-designed building which would be visually more attractive for residents of the surrounding neighborhood. (FF ¶ 28). Af-

ter considering the proposed alternative sites and detailing the problems with each, the Board explicitly found that site 4 was the only location which could both accommodate the physical needs of the University and enhance the interests of the adjoining community. (FF ¶ 27). Further, the Board found that construction of the law school at the proposed site was not likely to create objectionable traffic conditions on the neighboring streets, and that access to the proposed facility was adequate. The BZA was persuaded that any parking problem would be substantially alleviated by the reservation of 215 parking spaces for law students in the Nebraska Avenue parking lot and by the construction of a wooden perimeter fence [4] between site 4 and the Fort Gaines neighborhood. (FF ¶ 41).

The BZA found that the proposed design of the law school building was thoroughly responsive to the reasonable concerns of the neighbors. (FF ¶ 51). The Board noted that the University had agreed to locate window sills more than six feet above the floor in those classrooms which would face the Fort Gaines neighborhood, so that students would not be able to see out of the windows into private homes. (FF ¶ 45). The Board found it significant that the University had instructed its architects to eliminate the entire third floor of the building and place it below grade, thus making the building only one story high. (FF ¶ 46). Although this design change resulted in increased expense to the University, it accommodated the requests of neighbors that the view from their homes should remain substantially unchanged. The BZA also found, in conformity with the testimony of the dean of the law school, that if the Campus Plan were approved, only 700 persons would use the new law school on a daily basis, compared with 1500 persons per day who had used the Cassell Center in the past. (FF ¶ 58).

The Board approved the Campus Plan, but conditioned its approval of the pro-

---

**4.** To accommodate the wishes of the neighbors, the University agreed to place five pedestrian gates in the fence. The gates were to be designed to permit the neighborhood residents to gain access to University property through use of a key or magnetic card. Students would not be permitted to use these gates. (FF ¶ 18).

posed site for the law school on the incorporation of the terms of the July 11, 1989 Agreement between several community organizations and the University. This Agreement details the controls and restrictions with which the University is required to comply with operating the law school. Specifically, lights on the top floor of the building must be turned off every night at 11:00 p.m. Shades are to be placed on all windows which face residential neighborhoods. Commercial deliveries are to be permitted only from 8:00 a.m. to 6:00 p.m., Mondays through Fridays, and 9:00 a.m. to 5:00 p.m. on the weekends. All public access to the building is to be from one of three doors facing Massachusetts Avenue. Having conditioned its approval of the plan on the University's compliance with these conditions, the BZA concluded that the proposed site of the law school was appropriate, and that it was not likely to be objectionable to neighboring residents in terms of noise, the number of students, or other unfavorable conditions. (FF ¶ 62). According to the Board, the proposed location is "the only site where an existing unattractive building can be replaced with a well-designed building that provides improved views." (FF ¶ 28). The Board made no explicit mention of the objections interposed by the Office of Planning.

With respect to Parcel B, the BZA rejected ANC 3–D's recommendation that the Board redraw the proposed campus boundary of Parcel B to ensure that a greater portion of the existing buffer be preserved. The Board found that implementation of Phase I of the University's proposed landscape plan, with Phases II and III to follow later if necessary, would provide a sufficient buffer to permit the proposed sale of Parcel B. While the Board recognized the "legitimate concerns" of the GRA, it determined that the landscape plan adequately addressed the issue of the buffer on the western perimeter. (FF ¶ 22). Moreover, the BZA explicitly found that Phases II and III of the landscape plan sufficiently addressed the problem of the potential loss of trees. (*Id.*) In its Conclusions of Law, the Board stated that the landscape plan "will provide adequate protection to allow the deletion of Parcel B from the campus boundary."

## II

### LEGAL DISCUSSION

#### A. The Scope of Review and Related Concerns.

■ The "special exceptions" which the University requested in this case were approved by the BZA pursuant to 11 DCMR §§ 210 and 3108. As this court explained in *Stewart v. District of Columbia Bd. of Zoning Adjustment*, 305 A.2d 516, 518 (D.C.1973),

> [s]pecial exceptions, unlike variances, are expressly provided for in the Zoning Regulations. The Board's discretion to grant special exceptions is limited to a determination whether the exception sought meets the requirements of the regulation. The burden of showing that the proposal meets the prerequisite enumerated in the particular regulation pursuant to which the exception is sought rests with the applicant. In sum, the applicant must make the requisite showing, and once he has, the Board ordinarily must grant his application.

The Board's interpretation of the regulations must be accorded great weight, and must be upheld unless it is plainly erroneous or inconsistent with the regulations. *Levy, supra,* 570 A.2d at 748.

An applicant who seeks a special exception for college or university use must submit "a plan for developing the campus as a whole, showing the location, height, and bulk, where appropriate, of all present and proposed improvements." 11 DCMR § 210.4 (1987). To obtain approval of the Campus Plan, the applicant must prove that the proposed use "will be in harmony with the general purpose and intent of the Zoning Regulations" and "not likely to become objectionable to neighboring property because of noise, traffic, number of students, or other objectionable conditions." 11 DCMR §§ 210.2 and 3108.1; *see Levy, supra,* 570 A.2d at 742. In residential areas, the applicant must also demonstrate

that the proposed use "will not unreasonably expand the campus into improved low-density districts." *Levy, supra,* 570 A.2d at 742; 11 DCMR § 210.3 (1987).

The BZA unanimously held that the University had qualified for the special exceptions. With respect to most contested issues, the Board made comparatively detailed findings. In reviewing its decision, we must inquire

(1) whether the agency has made a finding of fact on each material contested issue of fact; (2) whether substantial evidence of record supports each finding; and (3) whether conclusions legally sufficient to support the decision flow rationally from the findings.

*Levy, supra,* 570 A.2d at 746 (citations omitted); *see also* D.C.Code § 1–1509(e) (1987).

### B. The FGCA's Petition for Review.

#### 1. General considerations.

The FGCA assails the BZA's decision approving the proposed construction of the new law school at site 4 on a number of different grounds. The fundamental premise of most or all of its contentions, however, is that the BZA permitted the University to focus on matters which the FGCA views as irrelevant (the University's interests) and ignored or minimized the interests of the residents of neighboring communities. We do not agree with this premise.

The BZA's findings and the testimony in the record demonstrate that this is not a case in which the University thumbed its nose at the neighbors and induced an inappropriately compliant BZA to submit to its will at the neighbors' expense. Rather, in conformity with the Board's 1988 directive, the University went out of its way to make peace with its erstwhile adversaries and made significant concessions which would cost it substantial sums of money but which would minimize any unfavorable impact on the surrounding communities. As the BZA stated in its 94th and final Finding of Fact,

[t]he Board is extremely impressed with the process initiated by the University and undertaken by it and the surrounding neighbors and neighborhood groups. The University and its professional consultants, as well as the many neighbors who participated in this effort, are to be commended for the work involved and the resultant Campus Plan. In particular the Board notes the existence of the Agreement which is exhaustive in detail and evidences strong commitments from all parties. *The Board will look to this Agreement and the process undertaken in this Campus Plan as a guide in future Campus Plan cases.*

(Emphasis added). The president of the NLC, the organization which had been formed three years earlier largely to resist the 1987 Campus Plan, testified enthusiastically in favor of the application (except for its treatment of Parcel B). We are satisfied that, in general, and especially with respect to the law school, no one ran roughshod over the rights of anybody else.

As we note below, the BZA's compliance in this case with some of the requirements of the Regulations and the case law has sometimes been less than meticulous. Not all i's were dotted, and not all t's were crossed. At least one of the Board's errors was serious; its handling of the petitioners' requests to cross-examine the University's rebuttal witnesses was indefensible. Nevertheless, the FGCA's objections must be assessed with the basic posture of the case in mind.

#### 2. "Improper focus on the University's needs."

The FGCA contends that the BZA's decision granting the special exceptions was based on incorrect legal criteria. It argues that the Board focused almost exclusively on the University's needs, rather than on the community's. The Board erred, according to the FGCA, both when it failed to consider a suggestion that the law school be constructed off campus and when it declined to require the University to show that there was no alternative site on the campus which would have been less objectionable to the neighbors. We are not persuaded by any of these contentions.

The BZA found that "the siting, massing and design of the law school building are appropriate" and that "the proposed plan is thoroughly responsive to the reasonable concerns of the neighbors." (FF ¶ 51). The evidence discussed in Part I A, *supra*, fully supports this finding.

The Zoning Regulations do not require that the Board treat the University's needs as irrelevant. Contrary to the FGCA's approach, a university—even a law school—is not to be presumed, for purposes of the Zoning Regulations, to be the land use equivalent of the bubonic plague.[5] In general, uses of land for educational purposes are "highly favored," 2 ROBERT M. ANDERSON, AMERICAN LAW OF ZONING, § 12.-09, at 508 (1986), and it has long been recognized that universities serve the public welfare and morals in important ways. *Cornell University v. Bagnardi*, 68 N.Y.2d 583, 593, 503 N.E.2d 509, 514, 510 N.Y.S.2d 861, 866 (1986); *see also* 2 ANDERSON, *supra*, § 12.15, at 526.

■ We are dealing here with special exceptions contemplated by the Zoning Regulations, *see Stewart, supra*, 305 A.2d at 518, and the Board's function on these facts is surely to determine whether a reasonable accommodation has been made between the University and the neighbors which does not interfere with the legitimate interests of the latter. *Cornell University, supra*, 68 N.Y.2d at 589, 503 N.E.2d at 511, 510 N.Y.S.2d at 861. The Regulations require only that the applicant demonstrate that it is not likely that the *proposed* site will become objectionable to neighboring properties. *See* 11 DCMR § 210.2 (1987). The BZA may grant a special exception for university uses in residential and special purpose districts "where in the judgment of the Board, those special exceptions will be in harmony with the general purpose and intent of the Zoning Regulations and Maps and will not tend to affect adversely the use of neighboring

property ..." *Levy, supra*, 570 A.2d at 742 (quoting DCMR § 3108.1); *see Rose Lees Hardy Home and School Association v. District of Columbia Board of Zoning Adjustment*, 324 A.2d 701, 706 (D.C.1974). "[T]he applicant is not charged with considering every option that any party in opposition might conceptualize." *Don't Tear it Down, Inc. v. District of Columbia Dep't of Hous. and Community Dev.*, 428 A.2d 369, 379 (D.C.1981).

The Board found, on the basis of substantial evidence in the record, that the 1989 plan accommodated the reasonable concerns of the residents and otherwise met the requirements for a special exception. Many or most of the erstwhile adversaries agreed. The standard applied by the Board was reasonable and legally correct.

*3. Expansion into low-density districts.*

■ The FGCA also maintains that the BZA failed to make a finding that the proposed location of the law school would not result in unreasonable campus expansion into low-density districts, as required by 11 DCMR § 210.3. While the Board did not use this precise phraseology, that is not conclusive. We are satisfied that the findings and conclusions which the Board did make demonstrate that it carried out the intent of this Regulation. We reach this conclusion, *inter alia*, on the basis of the following Findings of Fact:

26. In December, 1988, the University agreed to a major change.... [t]he law school was down-sized approximately 20,-000 square feet.

51. The Board finds that the siting, massing and design of the law school building are appropriate and that the proposed plan is thoroughly responsive to the reasonable concerns of the neighbors.

62. The Board finds that the University thoroughly analyzed all available sites for the location of the law school ... and

5. In spite of the oft-quoted declaration by a follower of the outlaw Jack Cade that "[t]he first thing we do, we'll kill all the lawyers," WILLIAM SHAKESPEARE, HENRY VI Part II, Act IV, Scene 2, we are not prepared to equate a reputable law school with a junk yard or with some other

trade or industry "commonly known as objectionable and obnoxious." *See, e.g., Town of Hobart v. Collier*, 3 Wis.2d 182, 184, 87 N.W.2d 868, 869 (1958) (quoting a municipal ordinance).

that the program and design [of the law school] will be compatible with the site and the adjacent neighborhood.

74. [T]he consultant later testified and confirmed that he reviewed the plans for the law school, and in his opinion, because of the geometry of the site [and] the topography and relationship of the site to Massachusetts Avenue, the University's proposal for the Cassell site is reasonable.

*See also* FF ¶¶ 10B, 43, 45 through 48, 56, 58, 59 and 65. The Board then concluded as a matter of law that:

Regarding the size of the proposed structure and the proximity of the building to the neighborhood, the Board has found that the siting and size of the building are appropriate.

*See also* the discussion in Part I B, *supra,* and note 10, *infra.*

The only rational conclusion which flows logically from the Board's findings is that there will be no unreasonable expansion of the campus into low-density residential areas, and that the siting and size of the building are appropriate. "While it is true that the [Board's] analysis did not track or even mention [the specific criteria set forth in the Regulation], we conclude that [its] inquiry adequately addressed the critical factors there identified." *In re D.R.M.,* 570 A.2d 796, 803 (D.C.1990). It would have been better if the Board had explicitly incorporated into its decision the language of the Regulation, so that no one could have doubted the Board's meaning. Its

failure to do so, however, does not require reversal of its decision [6] by this court.

### 4. What ever happened to site 3?

Although the new law school itself is to be constructed on site 4, the 1989 Campus Plan also calls for the regrading, landscaping and screening of a part of site 3 to convert a largely wooded and undeveloped tract of land into a parking lot. The BZA did not make any findings, evaluations or conclusions which referred to site 3 by name or number. The FGCA contends that the Board thus failed to address a significant contested issue in the case. "If the agency makes no finding of fact on a material contested issue, this court on review may not fill the gap by making its own determinations from the record, but must remand the case." *Levy, supra,* 570 A.2d at 746 (citations and internal quotation marks omitted).

The FGCA has contested this issue before this court, but it did not do so before the Board. This petitioner filed a proposed order with the BZA in which it included thirty-four proposed Findings of Fact, as well as almost a page and a half of single spaced "Conclusions of Law and Opinion." Site 4 was mentioned at least sixteen times. Site 3 was not mentioned at all. Neither OP nor ANC 3-E made any allusion whatever to site 3.[7]

 In the absence of exceptional circumstances, this court will not entertain contentions not raised before the agency. *Rafferty v. District of Columbia Zoning Comm'n,* 583 A.2d 169, 178 (D.C.1990).

---

6. The FGCA also contends that the BZA arbitrarily failed to follow the provisions of its May 9, 1988 order by approving a site for the law school near a low-density residential neighborhood. The earlier order, however, was not cast in stone on the issue, and did not preclude the selection of site 4 if sufficient protection was afforded to neighboring communities. We note in this connection that the president of the NLC, who had opposed the 1987 plan, and who regarded the May 9, 1988 order as "the Magna Carta for the community and its relationship with the University," urged the Board to approve the Campus Plan without delay. (FF ¶¶ 69 & 70).

7. In light of the failure of all concerned to mention site 3, it appears likely that their refer-

ences to site 4 or to the Cassell Center site were intended to refer to the entire proposed law school, including the relevant portion of site 3. When the Board found that "the proposed campus plan, including the facility for the law school, is not likely to become objectionable to neighboring property because of noise, traffic, number of students or other objectionable conditions" (FF ¶ 50), it was presumably referring to both sites.

Greater precision is desirable, for we cannot be certain that this is what was intended. Given all of the circumstances, however, we are satisfied that the failure of the BZA to specify site 3 by name does not warrant reversal.

The circumstances of the present case do not warrant our consideration of the FGCA's complaint about the treatment of site 3 when no such concern was presented to the BZA.

### 5. Failure to explicate the legal standard.

Relying on *Draude v. District of Columbia Bd. of Zoning Adjustment*, 527 A.2d 1242 (D.C.1987) (*Draude I*), the FGCA contends that the Board inadequately explained its standard for determining whether the proposed development is likely to have objectionable consequences for the community. The FGCA objects to the Board's failure to make a comparison between the effects on neighboring residential areas of the University's proposed construction of a law school and the consequences of the kind of use of the property which would be authorized without a special exception. *Draude I* mentions such a standard, *id.* at 1253, but does not mandate it; neither do we. *See also Draude v. District of Columbia Bd. of Zoning Adjustment*, 582 A.2d 949, 959–60 (D.C.1990) (*Draude II*). In this case, the Board did apply, in substance, the other test articulated in *Draude I*, namely whether the proposed use would significantly increase objectionable qualities over their current levels in the area. *Id.*[8] This standard is consistent with the Zoning Regulations. *See generally* 3 R. ANDERSON, *supra*, § 21.-09, at 652–54 (3d ed. 1986) (discussing the adequacy of various standards). The University presented evidence, including the testimony of a planner, an architect, and a traffic expert, which was sufficient to support the BZA's conclusion that this standard was met. Indeed, we agree with the following paragraphs in the University's submission:

> The University did more than demonstrate that the proposed use would be an improvement over previous use or present use. As required, the record shows and the BZA found that the use would not be objectionable based on the criteria of 11 DCMR § [210]. While the significant improvement over existing conditions at the Cassell site was found to be responsive to concerns of the neighbors, particularly Fort Gaines neighbors, this was not the standard applied by the BZA in reaching its ultimate determination.
>
> The warning in *Draude [I]* is meant to guard against inconsistent application of standards in special exception determinations. Petitioners' reliance on this point [is incompatible with] the BZA's actual findings, which are amply supported by the record.

### 6. The Office of Planning, the Advisory Neighborhood Commission, and "great weight."

The Zoning Regulations provide that "[b]efore taking final action on an application for use as a college or university, the Board shall submit the application to the District of Columbia Office of Planning ... for review and written reports." 11 DCMR § 210.6 (1987). The University complied with this requirement and, as we have noted, OP expressed reservations regarding the placement of the new law school at the Cassell Center site. Although no statute or regulation expressly so provides, the FGCA argues, and we agree, that the Board is required to demonstrate in its findings that it considered OP's views, and must provide a reasoned basis for any disagreement with them. *See, e.g., Committee for Washington's Riverfront Parks v. Thompson*, 451 A.2d 1177, 1193–94 (D.C.1982).

The BZA is also required to give "great weight" to the concerns of Advisory Neighborhood Commissions. *Levy, supra,*

---

8. The FGCA argues that it was improper for the Board to compare past uses of the Cassell Center with proposed future uses. Although the Cassell Center had once been utilized for athletic events and large social functions, the Center is now nearly vacant, and the University no longer uses it for such activities. The University could, however, resume its past uses of the Cassell Center without running afoul of the Zoning Regulations. Moreover, the prior utilization of Cassell Hall, for activities which attracted far more people to the site than the proposed law school is likely to draw, places in a more revealing perspective the FGCA's present complaints.

570 A.2d at 746; *see* D.C.Code § 1–261(d) (1987); 11 DCMR § 3307.2 (1987). As we explained in *Kopff v. District of Columbia Alcoholic Beverage Control Bd.*, 381 A.2d 1372, 1384 (D.C.1977),

> An agency must elaborate, with precision, its response to the ANC issues and concerns.... [T]he agency must articulate why the particular ANC itself, given its vantage point, does—or does not—offer persuasive advice under the circumstances.... [W]e believe that "great weight" implies explicit reference to each ANC issue and concern *as such,* as well as specific findings and conclusions with respect to each.

(Emphasis in original). ANC 3–E objected to the use of the Cassell Center as the proposed site for the law school and urged the Board to consider and adopt the arguments submitted by OP.[9] The FGCA maintains that the Board failed to give ANC 3–E's recommendation the requisite "great weight."

In its findings, the Board failed to make any mention of the fact that OP opposed the selection of site 4 for the new law school. The University presents only a perfunctory defense of this omission, claiming that "the OP position can best be described as equivocal." The sequence of events described in Part I D., *supra,* establishes to our satisfaction that OP continued to adhere, throughout the course of the case, to its initial opposition to the proposed site. The BZA should have explicitly acknowledged and addressed OP's reservations.

The Board did, however, discuss in some detail the concerns of ANC 3–E regarding the proposed site for the law school.[10] The Board specifically stated that it had accorded "great weight" to the views of ANC 3–E and of ANC 3–D and, while the assertion that this has occurred may not necessarily make it so in every case, we have no reason to question the Board's assurance here.

The FGCA also contends that the BZA violated the "great weight" requirement by not responding to ANC 3–E's suggestion that the law school be constructed on site 5, the Nebraska Avenue parking lot. We conclude that the Board dealt adequately with this suggestion. The Board found that site 5 was initially considered a viable location for the law school, and that an analysis was prepared for this site (and others) to determine whether it would be suitable. (FF ¶ 25). When the site evaluation criteria were applied to each of the apparently feasible locations, it was determined that site 4 was the only one that could accommodate both the needs of the University and the interests of the community (FF ¶ 27). The "topography of Site 5 would create a taller building facing the Westover Place and Embassy Row town-

---

9. The Board found, on the other hand, that the Campus Plan was supported by ANC 3–D, and by NLC and several homeowners' associations.

10. In its Conclusions of Law and Opinion, the Board said

> ANC 3–E has stated its opposition to the application. The ANC has essentially one objection—the location of the law school on the Cassell site. The Board concludes that the alternate site analysis conducted by the University was exhaustive, and the subject of numerous discussions with the community. No alternate site location within the context of a Campus Plan as a totality was offered by those who opposed the Cassell site location.
>
> Regarding the size of the proposed structure and the proximity of the building to the neighborhood, the Board has found that the siting and size of the building are appropriate, that the substantial use of below-grade space allows for improved views from the communi-

ty, as well as reduced light and sound, and that the controls placed on the design and use of the building will prevent objectionable impacts. The number of users was addressed by the Applicant and found by the Board to be an improvement over previous conditions. Traffic and parking were also addressed and found to be adequate with the restrictions on the users of the law school parking lot, the reserved spaces in the Nebraska Avenue lot, and the perimeter fence. Finally, the Board notes that in the Fort Gaines area, 20,000 square feet of gross floor areas has been deleted from the Plan to accommodate the interests of the community.

> The Findings set forth the response to the stated objections of the ANC. In conclusion, the Board has determined that the proposed site, design and use of the law school are appropriate and not likely to create objectionable impacts. The Board has given the required "great weight" to the position of ANC 3–E.

houses, [and] forty of the residents who now face an open parking area would face a building where none has existed." (*Id.*) Moreover, testimony during the hearings revealed that Westover Place and Embassy Row residents were opposed to construction on site 5 (*Id.*). The Board thus not only responded to the ANC's views, but also indicated why the ANC's suggestion was unsound. *See Bakers Local Union No. 118 v. District of Columbia Bd. of Zoning Adjustment*, 437 A.2d 176, 180 (D.C.1981).

■ Since the Board sufficiently addressed ANC 3–E's concerns, and since ANC 3–E largely adopted OP's objections, the Board's failure to make any explicit allusion to OP's position was harmless. We recognize that where both OP and the ANC have objected to a proposal, their combined opposition may merit greater weight in the decision-making calculus than the opposition of only one of these organizations standing alone. In this case, however, the Board has sufficiently responded to the substance of the objections, and reversal would not be appropriate.

### 7. The DCEPA.

■ The FGCA, joined with respect to this issue by Common Cause/DC as *amicus curiae*, contends that the BZA violated the DCEPA, D.C.Code §§ 6–981 to –990 (1990 Supp.), by failing to conduct an environmental assessment to determine whether the University's Campus Plan was the kind of project which was likely to have an adverse impact on the environment, and whether an environmental impact statement was required under the Act. *See* §§ 6–981, –982(a), –983(a) and (c). The University contends, among other things, that the issue was not adequately raised before the Board. Under the rather unusual circumstances of this case, we agree with the University.

The DCEPA, which became effective on October 18, 1989, contains a "grandfather clause" which exempts from its requirements any action "for which ... entitlement or permission to act by a District government agency has been approved before December 31, 1989." D.C.Code § 6–986(a)(8) (1990 Supp.). In the present case, the BZA voted at a public meeting held on December 6, 1989 to approve the special exceptions. The Board did not issue its formal written decision until February 21, 1990. In a "Memorandum in Lieu of Brief" which he filed to address only the question of coverage under the DCEPA, the Corporation Counsel argues that

> [i]n these circumstances, the Board should be held to have approved the applications, within the meaning of § 6–986(a)(8), on December 6, 1989 and thus to have acted correctly in not commencing a new round of inquiries, determinations and proceedings under the DCEPA.

The Corporation Counsel maintains that the BZA's deliberations had been concluded prior to the effective date of the Act and that the Board's written order simply effectuated what had been decided earlier. The purpose of § 6–986(a)(8), according to the Corporation Counsel,

> was clearly to permit agencies which had concluded their deliberations and come to a conclusion with respect to a project to avoid reopening the matter. The purpose is served by holding [that] the Board had "approved" the proposed actions here when it voted to approve them on December 6, 1989.

We have no occasion to decide whether this court would adopt on its own initiative the construction of the DCEPA proposed to us by the District's chief legal officer.[11] We conclude, however, that the BZA was not obliged to adopt a different interpretation, in the absence of a contention by

11. The FGCA argues, not unreasonably, that the Board's decision must be in writing, and that it does not become final until it has been filed in the record and served upon the parties. 11 DCMR §§ 3331.3, 3331.6 (1987). Petitioner also points out that a petition for reconsideration may only be filed after a written decision has been issued. *Id.* § 3332.2. We need not and do not decide whether these indicia of lack of finality carry over to the interpretation of the DCEPA's grandfather clause.

FGCA or by some other aggrieved party that this interpretation was not correct.[12]

Neither the FGCA nor anyone else identified this problem to the Board or asked for a ruling on it. The BZA did not receive any submission relating to the DCEPA between January 1, 1990, when the Act became effective, and February 21, 1990, when the Board issued its written decision, nor did anyone anticipate the issue during 1989. In fact, the only reference by the FGCA to environmental issues in its proposed Findings of Fact and Conclusions of Law was proposed Finding No. 33, in which the FGCA requested the Board to find that "there has been no analysis of the environmental impact of the law school on site 4 conducted by an impartial expert and filed with the application." The FGCA proposed no Conclusion of Law on the subject, made no mention of the DCEPA, and never discussed the applicability of the grandfather clause.

Essentially, the FGCA claims that the BZA erred by failing to hold, on its own initiative, and without any party having so contended in the proceedings before the agency, that although the DCEPA was not applicable when the BZA granted the special exceptions, it became applicable when 1990 dawned and the written decision had not yet been issued. According to the FGCA, the Board erred when it failed, *sua sponte*, to reopen a case which it had orally decided and which nobody had asked it to reopen. We do not agree with this position. As we have explained in an analogous judicial (rather than administrative) context,

[q]uestions not properly raised and preserved during the proceedings under examination, *and points not asserted with sufficient precision to indicate distinctly the party's thesis*, will normally be spurned on appeal.

*D.D. v. M.T.*, 550 A.2d 37, 48 (D.C.1988) (emphasis added) (quoting *Miller v. Avirom*, 127 U.S.App.D.C. 367, 369–70, 384 F.2d 319, 321–22 (1967)).

Environmental concerns are important, and we would be more reluctant to treat the point as having been waived if there were any appreciable danger that such a holding would contribute to the abdication of environmental values or to the pollution of the air or water or quality of life for the citizens of Fort Gaines or of the District. But there is no realistic threat of such baleful consequences in this case. Under proposed regulations promulgated on November 30, 1990 by the Mayor pursuant to the DCEPA, the Department of Consumer and Regulatory Affairs (DCRA) is the "lead" agency responsible for overseeing the preparation of an environmental impact statement whenever a building permit is required. *See* 37 DCR 7588, 7593 (Nov. 30, 1990), to be codified in 20 DCMR § 7203.-1(a). Moreover, we have been advised in a supplemental submission by the University, which the FGCA has not contradicted, that the DCRA has given the University a clean [environmental] bill of health in connection with the proposed site for the law school.[13] We are therefore confident that no injustice will flow from our invocation here of the general rule that arguments not presented to the agency will not be entertained by the court.[14]

---

12. The FGCA points out that two witnesses (in a record totalling some 4000 pages) explicitly invoked the DCEPA and requested that it be applied to the Campus Plan. But aside from the question whether a remark by a witness before the BZA on a subject is sufficient to preserve that subject for judicial review sought by someone other than that witness, neither of the individuals whose remarks are cited by the FGCA addressed the question whether the grandfather clause applied.

13. On February 20, 1991, the Administrator of DCRA's Housing and Environmental Regulation Administration advised the University by letter, *inter alia*, as follows:

Based on a finding of no significant environmental impact from the proposed project, we have determined that an Environmental Impact Statement is not required for the Washington College of Law project.

The Administrator further advised the University that the project is governed by other applicable District and Federal environmental requirements, and that it is subject to normal review relating to the removal of underground storage tanks and asbestos at the site.

14. We also note that the curious scenario in this case, in which the exemption provided by the grandfather clause ended after the oral decision but before the written one, is not likely to recur.

8. *The denial of cross-examination.*

Proceeding in an unorthodox manner which we deem altogether unacceptable, the Board permitted the University to recall two witnesses to testify in rebuttal, but denied petitioners the right to cross-examine them regarding their rebuttal testimony. This is not the first time that a District agency deciding zoning issues has proceeded in this manner. *See Citizens' Coalition Against the Proposed Brookings Office Bldg. v. District of Columbia Zoning Comm'n,* 516 A.2d 506, 512–13 (D.C. 1986) (court assumed, *arguendo,* that the practice was improper but found the error harmless). We hope it will be the last.

The following exchange occurred at the conclusion of the examination by counsel for the University of the first of its rebuttal witnesses:

> CHAIRPERSON THORNHILL: All right. Thank you very much, Mr. Brown.
>
> MR. NETTLER: Excuse me. I just have some cross-examination on just two points that he has raised—
>
> CHAIRPERSON THORNHILL: Are you kidding?
>
> MR. NETTLER: I am entitled to cross-examine him on his rebuttal testimony.
>
> CHAIRPERSON THORNHILL: No, you are not.
>
> MR. NETTLER: I certainly am. Excuse me but I am certainly entitled to cross-examine a witness who provides rebuttal testimony; and the Board has permitted me to do so in the past and has permitted other counsel to do so.
>
> CHAIRPERSON THORNHILL: We have not, Mr. Nettler; and there wasn't anything new about what Mr. Brown testified to.
>
> MR. NETTLER: Yes, he did. . . .

After counsel attempted to explain the reasons for his view that the witness had given testimony on rebuttal which went beyond his testimony in the case-in-chief, the colloquy concluded as follows:

> CHAIRPERSON THORNHILL: Mr. Nettler, we are not having cross-examination.
>
> MR. NETTLER: I reserve my right to object to the fact that that has not been provided us.
>
> CHAIRPERSON THORNHILL: Very well.

After the second rebuttal witness testified, counsel for the University, playing under the unconventional ground rules announced by the presiding officer, eschewed the time-honored words "your witness," which are frequently used by attorneys to tender the witness to opposing counsel for cross-examination, and asked instead:

> Madam Chairperson, are there questions of Mr. Arminster *from the Board?*

(Emphasis added). Chairperson Thornhill said "No," and reiterated her ruling that no cross-examination would be permitted. Counsel for the University stated that "just to protect the record," he wanted to be certain that opposing counsel could "file something for the record." The attorneys for petitioners were ultimately permitted to submit questions which they would have asked and the answers they expected to elicit, but no cross-examination was allowed.

■ The proceeding before the Board was a contested case. *Rose Lees Hardy Home and School Ass'n v. District of Columbia Bd. of Zoning Adjustment,* 324 A.2d 701, 707 (D.C.1974). A contested case is one in which a trial-type hearing is implicitly required, either by the organic act or constitutional right. *Lamont v. Rogers,* 479 A.2d 1274, 1278 (D.C.1984). The rebuttal witnesses were testifying about contested facts. Each party therefore had the right to "conduct such cross-examination as may be required for a full and true disclosure of the facts." D.C.Code 1–1509(b) (1987). Accordingly, the cross-examination which petitioners were entitled to conduct was that which is available at a trial-type hearing.

"In almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses." *Goldberg v. Kelly,* 397 U.S. 254, 269, 90 S.Ct. 1011, 1021, 25 L.Ed.2d 287 (1970). In *Greene v. McElroy,* 360 U.S. 474, 79

S.Ct. 1400, 3 L.Ed.2d 1377 (1959), the Supreme Court stated that

> the requirements of confrontation and cross-examination ... have ancient roots.... This Court has been zealous to protect these rights from erosion. It has spoken out not only in criminal cases ... but also in all types of cases where administrative and regulatory actions were under scrutiny. [Citations and footnotes omitted].

*Id.* at 496–97, 79 S.Ct. at 1413–14.

■ An administrative agency may neither refuse to permit any cross-examination nor unduly limit it. *Giant Food, Inc. v. F.T.C.,* 116 U.S.App.D.C. 227, 234, 322 F.2d 977, 984 (1963), *cert. dismissed,* 376 U.S. 967, 84 S.Ct. 1121, 12 L.Ed.2d 82 (1964). In all adjudicative proceedings, "cross-examination and confrontation are the handmaidens of trustworthiness in the face of factual dispute." *National Trailer Convoy, Inc. v. United States,* 293 F.Supp. 634, 636 (N.D.Okla.1968) (three-judge court). Although we have only a paper record before us, the presiding officer's choice of words (*e.g.,* "are you kidding?") appears to have been intended to ridicule counsel's perceived effrontery in requesting the right to cross-examine his adversary's rebuttal witnesses.

■ But a request to conduct perfectly conventional cross-examination is not ridiculous, and the reasons given by the Chairperson for not permitting it were spurious. Where, as here, a witness has been recalled on rebuttal, there is no doubt that he "may not only be examined on direct, but [also] cross-examined and re-examined." EDWARD W. CLEARY, MCCORMICK ON EVIDENCE § 4 at 7 (3d ed. 1984). The DCAPA "gives every party the right to submit rebuttal evidence." *Hilton Hotels Corp. v. District of Columbia Dep't of Employment Serv.,* 531 A.2d 999, 1000 (D.C.1987) (per curiam). Logically, at a "trial type" hearing, the statute must likewise give the adversary the right to cross-examine the witnesses who provide such evidence.

If the witness had in fact said nothing new, then his testimony would not have been genuine rebuttal testimony in the first place. *See* 6 JOHN H. WIGMORE, EVIDENCE, § 1873, at 672–73 (James H. Chadbourn rev. ed. 1976); *Throckmorton v. Holt,* 12 App.D.C. 552, 583–85 (1898). But once the University had been permitted to present the same evidence for a second time, petitioners had the corresponding right to cross-examine for a second time.[15] If the Chairperson intended to intimate that cross-examination of rebuttal witnesses was not permitted in this case because it is not permitted in *any* case—and that seems to be implicit in the words "are you kidding?"[16]—then such a practice is impermissible no matter how uniformly the Board may have followed it.

■ The Board undoubtedly has broad discretion with respect to the nature, scope and duration of cross-examination. *See, e.g., N.L.R.B. v. Greensboro Coca Cola Bottling Co.,* 180 F.2d 840, 846 (4th Cir.1950). But that discretion must be exercised reasonably. The Board may, for example, restrict cross-examination if further interrogation on a particular subject would be more prejudicial than probative, *Goldman v. United States,* 473 A.2d 852, 856 (D.C.1984), or if the evidence sought to be elicited would be cumulative. *Hilton v. United States,* 435 A.2d 383, 388 (D.C. 1981).[17] The Board may not, however, prohibit cross-examination altogether, *Washington v. United States,* 461 A.2d 1037,

---

**15.** Where no new material has been presented on rebuttal, the opponent has no absolute right to present new evidence in *surrebuttal. Gregory v. United States,* 393 A.2d 132, 137 (D.C.1978). This is a far cry, however, from a refusal to permit cross-examination of rebuttal witnesses. *See* SPENCER A. GARD, JONES ON EVIDENCE § 24:1, at 74–75 & n. 5 (4th ed. 1972) (opponent may impeach rebuttal witness even where he has no right to present surrebuttal).

**16.** Counsel for the GRA claims in his brief in this court that this is what "the Board" said. The point may be inferable from the colloquy which we have reproduced.

**17.** Any restriction based on the notion that the evidence sought to be adduced is cumulative must surely be applied even-handedly. It will not do to allow one party to ask its questions twice, but to confine the other to doing so once.

1038 (D.C.1983), and must permit such cross-examination to proceed at a stage of the case when its effect is not unreasonably diluted. *See People v. Becker,* 210 N.Y. 274, 299–300, 104 N.E. 396, 405–406 (1914); *Town of Somerset v. Montgomery County Bd. of Appeals,* 245 Md. 52, 66–67, 225 A.2d 294, 303 (1966). Any restrictions which the Board may impose must be rationally related to some legitimate purpose. Whether testimony has been presented in a party's direct case or on rebuttal has no rational relationship to the opponent's need to conduct cross-examination. The Board's apparent "bright line" rule of practice on the subject is therefore unacceptable. Indeed, the University's only real argument in support of the Board's approach is that any error was harmless.

 The FGCA ˙has been unable to point to any prejudice. It claims in the most general terms to have been denied "the opportunity at the public hearings to cross-examine University witnesses on important issues such as the site selection process' failure to incorporate neighborhood concerns and the limited usefulness of steps the University planned to take to mitigate objectionable impacts." But the witnesses in question had been cross-examined at length on these subjects in connection with their initial testimony, and the BZA's findings were adequately supported without consideration of their rebuttal testimony. The University's case with respect to the selection of a site for the law school was a strong one, especially in light of the support which its decision drew from the adversaries of the 1987 Campus Plan. The Board's procedural error was a serious one, but we are satisfied that it did not result in substantial prejudice to the FGCA. *See Citizens' Coalition Against the Proposed Brookings Office Bldg. v. District of Columbia Zoning Comm'n,* 516 A.2d 506, 512–13 (D.C.1986).

## C. The GRA's Petition for Review.

 Like the FGCA, the GRA was not permitted to cross-examine a witness for the University with respect to his rebuttal testimony. For reasons discussed below, we are of the opinion that the University's case with respect to Parcel B was less compelling than its evidence regarding the proposed site for the new law school, and the question whether the Board's restriction on the GRA's right to cross-examine requires vacation of its decision is therefore closer than in the case of the FGCA. Nevertheless, we conclude that there was no substantial prejudice.

In its Finding of Fact No. 22, the Board stated in pertinent part that

the Landscape Plan adequately addresses the issue of buffer on the western perimeter. The Board finds that Parcel B may be deleted from the campus boundary without adverse impact on the adjacent property owners. Finally, the Board finds that Phases II and III of the Landscape Plan will address the legitimate concern of the loss of trees and the construction of [a] proposed addition [to University buildings located near Parcel B]. The Board will have further review of such additions at the time the University submits plans for approval.

This finding is supported by substantial evidence. Indeed, we have no doubt that if only the evidence presented by the University were considered, and if the testimony presented by the opponents is rejected, then the quoted finding would be altogether unassailable.

The University's landscape architect and planning expert, Mr. Joseph Brown, testified that the three-stage Plan for the area adjacent to Parcel B was negotiated at length with neighboring residents. According to Mr. Brown, the Landscape Plan was developed with substantial input from the residents, and it assured that there would be adequate buffering after Parcel B was deleted. He described these consultations as "a very long and deliberate landscape process which I haven't seen the like of for a long time."

With respect to the adequacy of the proposed buffer, Mr. Brown explained, among other things, that a nine-foot fence would surround the campus and that there would be substantial planting of trees and shrubs "just below [the] ridge line and just above

it because that is the real area where landscape makes a difference, just on the crest and below the crest on the ridge." He expected that, as a result, "a landscape veil is going to come down around the whole university and provide a very deliberate enclosure which will make a very high-quality landscape perimeter."

The University also agreed to the staged implementation of Phases II and III of the Landscape Plan, which were designed to supplement the initial buffer as necessary. Phase II of the Plan contemplates the planting of additional trees and shrubbery, and is to be put into effect "immediately upon removal of any of the six trees on Parcel B." Phase III provides for additional landscaping in the event a contemplated addition is made to two nearby university buildings.[18] Moreover, as we have noted, Parcel B has been rezoned to R–1–A, the most restrictive classification, so that, at most, two single-family residences could be constructed on the property. Finally, the Office of Planning supported the proposed boundary change.

The Parcel B issue was vigorously contested by the GRA, however, and this organization did not enter the fray alone. In spite of the University's consultations with neighborhood groups, there was no broad consensus among affected citizens in favor of the proposed boundary change. The president of the NLC, who urged swift approval of the proposed site for the law school, requested on behalf of his organization, with respect to Parcel B, that the Board "redraw the campus boundary to ensure that a greater portion of the existing buffer is preserved." (FF ¶ 73) ANC 3–D, which also favored the Campus Plan with respect to the law school, "asked that

the Board redraw the boundaries of Parcel B to include and retain at least the twelve existing mature trees as well as an appropriate buffer area, [and] that the University assume responsibility for preservation, care and maintenance of the vegetation included in this newly formed boundary." (FF ¶ 68).[19] The President of the Spring Valley–Wesley Heights Citizens Association, representing more than 1200 households which surround the University on three sides, endorsed the position of ANC 3–D. (FF ¶ 75). Councilman James Nathanson, who represents Ward 3 on the Council of the District of Columbia, "urged the Board not to accept houses in place of trees for buffering," thus implicitly objecting to the proposed erection of two single-family houses on Parcel B.[20]

The opponents also took on the University on the merits. Both in its cross-examination of the University's witnesses and in presenting its own case, the GRA focused on the perceived inadequacy of the University's plan to preserve adequate buffering between the University and the community in the immediate future. Joseph Brown, the University's architectural expert, admitted that the trees which would be removed when Parcel B was developed were quite high, and that their replacements would be shorter. The following exchange ensued:

MR. NETTLER: So, what we are doing is planning for a buffer for the next generation's next generation?

MR. BROWN: Well, I think that's a good explanation, only it's the next generation. It's just like raising kids. You better make sure that you plan for every generation or you end up with a lot of dead trees, beautiful, old dead trees and no replacement.

---

18. The Agreement with the neighbors contains rigorous controls over the height, location and related provisions of the proposed addition. In fact, the University agreed that the neighbors would have the right to veto a third story on the addition if the University failed to demonstrate that such a third story would not have an adverse impact. In addition, the BZA noted that it would further review any proposed addition if and when an application was made. (FF ¶ 22).

19. The Commission also recommended that the University assume responsibility for the preser-

vation, care and maintenance of the vegetation included in the new boundary, and that a covenant be recorded between the neighbors and the contract purchaser of Parcel B which would require a landscape, grading and slope plan for this parcel.

20. Under the University's proposal, the property would be rezoned to R–1–A, the most restrictive classification, so that only two homes could be constructed.

Mr. Brown also acknowledged that he and some of the Glenbrook Road residents had identified twelve tulip poplars on Parcel B that should be preserved to provide a buffer. He was of the opinion that construction should not intrude upon the dripline of a tulip poplar, and that the dripline for the trees on Parcel B should be at least 15 feet from the trunk of each in order to preserve them from destruction. He conceded that it appeared from the development plan proposed by the contract purchaser of Parcel B that construction would take place within 15 feet of many of these trees.[21]

Martha Donnelly, an expert in landscape planning, landscape architecture and horticulture, provided detailed testimony on behalf of the GRA. Ms. Donnelly anticipated that, as a result of regrading necessitated by the topography of Parcel B, virtually all of the trees and vegetation would be destroyed by the proposed development.[22] She testified that the vegetation on the property, including more than 40 to 50 trees ranging from 60 to 100 feet in height, would be irreplaceable, because it blocks the view of the broadcast tower, eliminates glare from campus lights, and reduces noise from various University activities. Ms. Donnelly testified that the need for a buffer would become even more critical as the University proceeded with the proposed expansion of the arts center on the edge of Parcel B.

Ms. Donnelly was of the opinion that the landscaping plan proposed by the University would be inadequate to replace the mature vegetation on Parcel B. Under the plan, only certain red maples would attain a height of 50 to 60 feet. Even assuming favorable conditions, it would take 50 to 60 years for the new trees to reach that height. Ms. Donnelly stated that the trees were selected for their woodland character rather than for screening purposes. She also questioned whether the trees could be planted successfully on the narrow strip of level ground remaining on University property if Parcel B were sold.

On cross-examination, Ms. Donnelly acknowledged that she had been involved in the case for less than a month. She stated that she did not evaluate Phases II and III of the University's Landscape Plan, but addressed only the effect of the deletion of Parcel B and the incorporation of Phase One. Ms. Donnelly noted, however, that these later phases were contingent upon the loss of trees on Parcel B or on the construction of another building, which might never take place.[23]

Although the Board noted GRA's position, (FF ¶¶ 84 & 85), its discussion of Ms. Donnelly's testimony was limited to the following:

The testimony of GRA and its landscape consultant focused on the impact on the existing trees of locating two houses on Parcel B. The GRA has a particular concern about twelve identified trees which it asserts are critical to the retention of an adequate buffer.

\* \* \* \* \* \*

GRA's landscape architect testified that she based her analysis and conclusions on the Campus Plan and Phase I of the Landscape Plan. On cross-examination, the landscape architect stated that she had not reviewed Phases II and III of the Landscape Plan.

21. Mr. Brown also agreed that in order to preserve trees within this 15-foot area, the developer would have to work around them with hand equipment and with a tree surgeon on site. Mr. Brown recognized that, once the campus boundary was changed, the Board would lose any authority to supervise the development on the site or to maintain any portion of the site as a buffer.

22. Mr. Brown's testimony on this point was couched in the language of hope rather than of conviction: "If some of these tulip poplars were to be lost, which we don't think has to happen— we've got then another layer of planting that we have proposed to compensate for that poplar loss, if it were to occur, which we hope it won't."

23. Several other witnesses testified in favor of GRA's position on this issue, but Ms. Donnelly's testimony was by far the most detailed. GRA's other expert, Dr. Richard Hammerschlag, who gave testimony consistent with Ms. Donnelly's, conceded that he had made only a cursory visit to the site and that his testimony was largely based on information provided by Ms. Donnelly.

The Board did not explicitly address Mr. Brown's concessions regarding the time that would elapse before the new trees reached maturity. It likewise failed to analyze in any detail the views of ANC 3–D, except to state that it had accorded them "great weight."

 We think the detailed testimony presented by the GRA, and especially the specific criticisms regarding the landscape plan might well have been accorded more comprehensive treatment than the BZA provided. *See Citizens Ass'n of Georgetown, Inc. v. District of Columbia Zoning Comm'n,* 402 A.2d 36, 47 & n. 19 (D.C. 1979); *cf. Eilers v. District of Columbia Bureau of Motor Vehicles Servs.,* 583 A.2d 677, 684–86 (D.C.1990). Nevertheless, we conclude that the Board has made an adequate finding of fact on each contested issue of fact raised by the GRA through Ms. Donnelly and other witnesses and that the testimony on behalf of the university which the Board obviously credited supports its findings. In weighing Ms. Donnelly's testimony against Mr. Brown's, the Board could reasonably take into consideration Ms. Donnelly's comparatively brief involvement in the case. Moreover, although the Board did not deal explicitly with the views of ANC 3–D, *see Kopff, supra,* 381 A.2d at 1384, this omission was harmless, for substantially the same objections were sufficiently addressed in connection with the views of the GRA and of other community organizations.

 We turn now to the Board's restriction of GRA's cross-examination. Mr. Brown's rebuttal testimony was very brief, and more than half of it was devoted to the law school issue. Nevertheless, the University's architectural expert offered a vigorous challenge to the GRA's contentions and to the reliability of the GRA's witnesses:

In the area of the Sterns' home,[24] in what is called the Phase I Area, there are more than a hundred trees, new trees proposed in a perimeter that is deep enough to hold those trees.

So, the issues that are presented that that ridge line is too narrow and there is

very little new planting being offered is really not factual; and I think those statements were made by people who have not reviewed the drawings and counted the trees and looked at the size of the trees and looked at the fact that we are relocating the road and removing parking spaces.

So, it is a great deal of opinion that has been brought to the Board based on not knowing the details of what has been proposed.

In requesting the right to cross-examine Mr. Brown, counsel for the GRA argued that

[h]e testified that there was a hundred trees that are being replaced on this site. I have been sitting here counting the number of trees and bushes abutting Parcel B and I can't count more than 40 that's on there, and for him to make that statement, *which was not a statement that he had made before,* and for me not to be allowed to cross-examine him about that, I think would deprive my clients of the rights they are entitled to under the Administrative Procedure Act.

(Emphasis added). Although Mr. Brown had been permitted, on rebuttal, to supplement, or at least to reinforce, his testimony in chief, the Chairperson insisted that "we are not having cross-examination." We reiterate our disagreement with this ruling.

Our review of the record discloses, however, that Mr. Brown's original testimony when he was first called by the University went into the issue of the trees in sufficient depth to allow effective cross-examination at that time. In his initial appearance, Mr. Brown apparently testified from charts depicting the locations of buildings and landscaping. He presented a document showing the "actual planting plan with species located, a planting schedule, *size and number* of trees noted and types of trees ..." He again pointed out that the plan (which had been circulated to the community) showed the "planting schedule, type, [and] size," and he described the buffer for parcel B. The three phases of the plan for the landscape barriers are in evidence. The kinds and sizes of the trees to be planted

24. Jill and Jeffrey Stern, principals in GRA, are co-petitioners in this case.

are enumerated. With respect to the ridge line and crest involving Parcel B, Mr. Brown testified that they are "putting *a lot* of additional trees and shrubbery there." (*Id.*) He also discussed the poplar trees and their relation to Phases II and III. (*Id.*)

Mr. Brown thus provided substantial testimony about the number of trees (the focus of the uncrossed rebuttal) when he testified during the University's "case in chief." If opposing counsel thought that this number was significant, he had ample opportunity to explore it then. Moreover, since the actual numbers and types of trees are reflected in the exhibits, counsel could readily comment in argument on any inconsistency between the numbers reflected in the drawings and those mentioned during rebuttal. Indeed, the Board permitted the GRA (as well as the FGCA) to provide written submissions regarding the University's rebuttal testimony, and the GRA took full advantage:

> If the Association had been permitted to cross-examine Mr. Brown it would have questioned him regarding his assertion that the landscape plan will add 100 trees to the boundary between the University and the residential area. Exhibit D to the University's hearing booklet—Area "A" Enlargement: Landscape Planting Plan Phase One—shows 46 trees and bushes being planted along the boundary of Parcel B. Included are nine 3½ inch caliper maple trees, numerous holly bushes and some ten foot cypress trees. Many of the trees and bushes are shown being planned in an area along the boundary which Martha Donnelly and Dr. Richard Hammerschlag testified could not support such plantings. To the extent any buffer is created by these plantings—assuming they survive—the buffer will not exist as such for at least thirty years.[25]

The GRA was also permitted to file proposed findings of fact, and discussed Mr. Brown's testimony and its credibility or lack thereof in some detail.

Post-hearing written submissions may not always be an acceptable substitute for cross-examination. The controversy over Parcel B had evolved in substantial part into a battle of the experts. On rebuttal, Mr. Brown was allowed to testify, in effect, that Ms. Donnelly and others did not know what they were talking about. Counsel for the GRA sought the opportunity, through cross-examination, to try to establish then and there that it was Mr. Brown who was mistaken with respect to significant disputed facts. His position in this regard is understandable.

But even if it cannot be said with mathematical certainty that the Board's error did not affect the result, mathematical certainty is not required; "fair assurance" is sufficient. *See R. & G. Orthopedic Appliances & Prosthetics, Inc. v. Curtin*, 596 A.2d 530, 538–41 (D.C.1991). Atmospherics aside, the evidence with which counsel for GRA proposed to confront Mr. Brown was available for use in briefing. Realistically, we think it most unlikely that the result would have been different if the erroneous ruling had not been made. Under the circumstances, we harbor "no substantial doubt [that] the agency would have made the same ultimate finding with the error removed." *Arthur v. District of Columbia Nurses' Examining Bd.*, 459 A.2d 141, 146 (D.C.1983); *see also Citizens' Coalition, supra*, 516 A.2d at 513.

### III

### CONCLUSION

For the foregoing reasons, the BZA's order is hereby

*Affirmed.*

---

**25.** In post-hearing submission to the Board, counsel for the GRA also represented that he had intended to cross-examine Mr. Brown regarding conversations which Mr. Brown had allegedly had with local residents, and also regarding the question whether Phases II and III would be carried out. Neither of these subjects was addressed during Mr. Brown's brief remarks on rebuttal. The proposed cross-examination would therefore have exceeded the scope of the direct rebuttal testimony, and the Board could properly have declined to permit it.