*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 18-AA-1260

SHERIDAN KALORAMA HISTORICAL ASSOCIATION, *et al.*, PETITIONERS,

v.

DISTRICT OF COLUMBIA BOARD OF ZONING ADJUSTMENT, RESPONDENT,

and

THE FEDERATION OF STATE MEDICAL BOARDS, INC., INTERVENOR.

Petition for Review of the Decision and Order of
the District of Columbia Board of Zoning Adjustment
(BZA-19659)

(Argued February 20, 2020　　　　　　　　　　Decided July 2, 2020)

*Samantha L. Mazo*, with whom *Cozen O'Connor*, *Meridith Moldenhauer*, *Kari Gardiner*, were on the brief, for petitioner.

*Richard S. Love*, Senior Assistant Attorney General, with whom *Karl A. Racine*, Attorney General for the District of Columbia, *Loren L. AliKhan*, Solicitor General and *Caroline S. Van Zile*, Deputy Solicitor General, were on the brief, for respondent.

*Martin P. Sullivan* for Intervenor.

Before GLICKMAN and BECKWITH, *Associate Judges*, and FERREN, *Senior Judge*.

FERREN, *Senior Judge*:  Petitioners Sheridan Kalorama Historical Association and Sheridan-Kalorama Neighborhood Council (collectively "petitioners") seek review of an order of the Board of Zoning Adjustment ("BZA") granting the application of the Federation of State Medical Boards ("FSMB") for a "special exception" to use its existing residential building (the "Property"), located at 2118 Leroy Place, N.W., as an "Advocacy" (lobbying) office.  The petition for review challenges the BZA's findings and conclusions that:  (1) FSMB is qualified for a special exception as a "nonprofit organization" under the zoning regulations; (2) FSMB's use of the Property will not "tend to adversely affect the use of the neighboring properties," nor create "adverse impacts on parking and traffic"; and (3) FSMB is not required to seek a "variance" because the Property has a gross floor area ("GFA") greater than 10,000 square feet. We reject petitioners' first and third challenges but remand the case for the BZA to afford the required "great weight" to the recommendations by the District of Columbia Office of Planning ("OP") on petitioners' second challenge as to the effects of the special exception on "the use of the neighboring properties."

## I.  Facts and Proceedings

### A.     The Property and Leroy Place, N.W.

The Property is a three-story building situated within an R-3 zone[1] in the Sheridan-Kalorama Historic District.  It was built in 1902 and has been used mostly by foreign governments (including Hungary and Colombia) as a chancery until the Colombian government sold the Property to FSMB on July 18, 2017.  The Property sits on a large rectangular-shaped lot measuring 5,124 square feet in land area, facing Leroy Place, N.W. (a narrow one-way street) on the north and abutting a public alley on the south.  Single-family dwellings occupy the east and west sides of the Property.  Roughly seventy-five percent of the neighborhood on Leroy Place, N.W. is residential; the remaining twenty-five percent is non-residential, principally embassies, the Russian Cultural Center, and a hotel.  According to the District of Columbia Department of Transportation ("DOT"), the Property is "located less than 250 feet from Connecticut Avenue, N.W.," about "500 feet from Connecticut

---

[1]  An R-3 zone is a zoning classification which allows row dwellings as a matter of right.  11 DCMR § 105.1(a)(3).  The "Future Land Use Map," as part of the Comprehensive Plan, designates an R-3 zone as "moderate density residential." 10-A DCMR § 225.4.  This designation is used to define the District's row house neighborhoods, as well as its low-rise garden apartment complexes.  *Id.* Furthermore, the "General Policy Map" of the Comprehensive Plan designates Leroy Place, N.W. as part of a neighborhood conservation area, "a category used for primarily residential areas in which development is [l]imited . . . [and] small in scale."  10-A DCMR § 223.5 (2014).

Avenue bus stops," and four-tenths of a mile from a Massachusetts Avenue bus stop and the DuPont Circle Metro. Moreover, two parking garages are within one- and two-tenths of a mile from the Property.

## B.    FSMB's Application for a Special Exception

FSMB is a Nebraska nonprofit corporation, with headquarters in Euless, Texas, composed of seventy state and territorial medical "licensing" and "discipline boards" in the United States. It has 168 full-time employees, eight of whom are stationed in the District of Columbia. According to its articles of incorporation, FSMB is "organized exclusively for scientific and educational purposes."[2] For its operations in the District, FSMB explained that it annually spends about $400,000, or roughly one percent of its budget, on "advocacy" (which means "lobbying" under

---

[2] FSMB's more specific purposes include: (1) "keep[ing] itself and its members informed concerning the medical and other healing arts practice acts of the District of Columbia, the several states of the United States . . . , " (2) "study[ing], determin[ing], and/or advanc[ing] the adoption and maintenance . . . of adequate and uniform standards for licensure in medicine . . . ," (3) "develop[ing] and improv[ing] the quality of licensing examinations given to members of the medical profession, and . . . assist[ing] by means of research and study the member medical boards to improve the quality of their examinations," and (4) "obtain[ing] and disseminat[ing] information regarding proposed legislation and administrative actions affecting the healing arts and licensure."

a Senate Disclosure rule) and is exempt from federal income tax under 26 U.S.C. § 501(c)(6).[3]

FSMB bought the Property as a permanent location for its "Advocacy office." On October 23, 2017, it filed an application under the zoning regulations for a "special exception,"[4] entitling it, as a "nonprofit organization,"[5] to use its "existing residential building[]" for a nonprofit purpose.[6] To enhance its prospects for obtaining favorable consideration, FSMB proffered various restrictions on its use of the Property, such as limiting the number of employees in the office to twenty-five and agreeing to notify neighbors in advance of each quarterly reception there, hosting no more than fifty guests.

---

[3] A § 501(c)(6) organization includes "[b]usiness leagues, chambers of commerce, real-estate boards, boards of trade, or professional football leagues (whether or not administering a pension fund for football players), not organized for profit and no part of the net earnings of which inures to the benefit of any private shareholder or individual." 26 U.S.C. § 501(c)(6).

[4] 11 DCMR X § 901.2.

[5] 11 DCMR U § 203.1(n). The zoning regulations define a "nonprofit organization as: An organization organized, registered with the appropriate authority of government, and operated exclusively for religious, charitable, literary, scientific, community, or educational purposes, or for the prevention of cruelty to children or animals; provided that no part of its net income inures to the benefit of any private shareholder or individual." 11 B DCMR § 100.2.

[6] *Id.*

To obtain a special exception, FSMB had to satisfy a two-part "general" requirement: that its nonprofit use of the Property as an office [1] "[w]ill be in harmony with the general purpose and intent of the Zoning Regulations and Zoning Maps" and [2] "[w]ill not tend to affect adversely the use of neighboring property. . . ."[7] Only the second general requirement is at issue here.

In addition, FSMB had to comply with eight "specific" requirements, the first two of which are in the subsection heading, the last six of which are numbered.[8] That heading provides that the building must be an "existing residential building[]," used by a "nonprofit organization" for nonprofit purposes. As to the other specifics, (1) the building must either be "listed in the District of Columbia's inventory of Historic Sites" or "located within a district, site, area, or place listed on the District of Columbia's Inventory of Historic sites"; (2) "the gross floor area of the building in question, not including other buildings on the lot, [must be] 10,000 square feet (10,000 sq. ft.) or greater"; (3) the use of the building and land "shall not adversely affect the use of the neighboring properties" (reflecting the second general

---

[7] 11 DCMR X § 901.2. (a) & (b); BZA Decision and Order (Oct. 30, 2018) at 8, 9.

[8] 11 DCMR X § 901.2. (c) ("such special conditions as may be specified in this title"); *see* 11 DCMR U § 203.1(n) (1)-(6); Decision and Order at 9.

requirement quoted above); (4) "the amount and arrangement of parking spaces shall be adequate and located to minimize traffic impact on the adjacent neighborhood"; (5) "no goods, chattel, wares, or merchandise shall be commercially created, exchanged or sold" on the Property, except for items "related to the purposes of the nonprofit organization"; and (6) the BZA, "after review and recommendation by the Historic Preservation Review Board," must approve "[a]ny additions to the building or any major modifications to the exterior of the building or to the site."[9]

Prior to the BZA's public hearings on FSMB's application, multiple parties weighed in, expressing their approval or disapproval. *First*, a multitude of Leroy Place, N.W. residents submitted letters opposing FSMB's application, expressing concerns about increased density, traffic, pollution, noise, and erosion of the residential nature of the neighborhood. *Second*, on November 20, 2017, Advisory Neighborhood Commission 2D ("ANC-2D") convened a public meeting and resolved to oppose FSMB's application, without stating its reasons. *Third*, DOT filed two reports, concluding that FSMB's application "will have no adverse impacts on the travel conditions" of the District's transportation network, while acknowledging "a minor increase in vehicular, transit, pedestrian, and bicycle trips."

---

[9] 11 DCMR U § 203.1(n) (1)-(6); Decision and Order at 9.

*Fourth*, OP filed a report on January 25, 2018, recommending approval of FSMB's application, subject to conditions (among others) limiting the number of employees stationed at the Property to fifteen, prohibiting FSMB's employees and visitors from parking on Leroy Place, N.W., and requiring annual meetings and events to be held off-site. OP further conditioned its recommended approval on FSMB's providing documentation: (1) that "record[s] information regarding expected deliveries and visitors to the site," and (2) that the Property satisfied the GFA requirement.[10]

### C. BZA's Public Hearings

On January 31, 2018, the BZA held its first public hearing on FSMB's application. Petitioners launched their opposition through the testimony of two expert witnesses, one opining on the definition of "nonprofit organization"[11] in the applicable zoning regulations, the other testifying on land use policy. The first to

---

[10] In addressing the approval process, FSMB asserted, and the BZA agreed, that the GFA requirement is "something that the zoning administrator would determine." They also agreed that the District of Columbia Department of Consumer and Regulatory Affairs ("DCRA") "would have to verify" the GFA of the Property when FSMB applied for a building permit. However, petitioners noted wariness that given DCRA's heavy workload, it would give only cursory review to the submission by FSMB's architect.

[11] See supra note 5.

speak, Nancy Kuhn, a tax law expert, testified that the definition of a "nonprofit organization" under the zoning regulations reflects the requirements of the tax exemption for charitable organizations under 26 U.S.C. § 501(c)(3),[12] and that FSMB failed the "operational test" under that provision. She added more specifically that, rather than operate "exclusively for charitable purposes" – that is, "for the benefit of the public," as required of a § 501(c)(3) organization – "they operate for the benefit of their members to promote the medical profession[,] which is appropriate for a 501(c)(6)" (FSMB's exempt status)[13] but not for a 501(c)(3). She explained that FSMB's activities promote the "business interests of the physicians" in operating "a program of testing" the qualifications of physicians who seek certification as "specialists."

---

[12] 26 U.S.C. § 501(c)(3) provides: "Corporations, and any community chest, fund, or foundation, *organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes*, or to foster national or international amateur sports competition (but only if no part of its activities involve the provision of athletic facilities or equipment), or for the prevention of cruelty to children or animals, *no part of the net earnings of which inures to the benefit of any private shareholder or individual*, no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation (except as otherwise provided in subsection (h)), and which does not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of (or in opposition to) any candidate for public office." (Emphasis added).

[13] See *supra* note 3.

A member of the Zoning Commission who was sitting on the BZA for this case expressed considerable skepticism about Ms. Kuhn's testimony. As the commissioner put it, "educating their members, making sure that they are providing excellent medical service, isn't that a, I mean ultimately that's a benefit to the public."[14] He continued, "I'm not even seeing for the benefit of the public in the definition."

Ms. Kuhn replied with a new theme: that the last sentence in the zoning regulation's definition of "nonprofit organization" precludes inurement of any net income "to the benefit of any private shareholder or individual."[15] That sentence (which also appears in FSMB's § 501(c)(6) exemption)[16] precludes such benefit to an FSMB "member," she said, apparently referring to the benefits (professional certifications) physicians receive from the fees they pay for "testing services" that allegedly generate "$40 million worth of revenue" for FSMB. The commissioner observed that her argument "might be relevant" if "this were a tax case," but he

---

[14] As a 501(c)(6) organization, FSMB must operate to improve some common business conditions of its members, including the District of Columbia Board of Medicine, whose mission is to "protect and enhance the health, safety, and well-being of District of Columbia residents."

[15] See *supra* note 5.

[16] See *supra* note 14.

stressed (not entirely to the point) that the zoning definition "is not the IRS definition."

The next to testify, petitioners' land use expert, Ellen McCarthy, opined that "the major adverse impact" on the neighborhood of a special exception for FSMB would be "the destabilizing of the residential real estate market." She summarized that granting FSMB's application would "put a quick stop" to the recent trend in the Sheridan-Kalorama Historic District toward restoring "formerly non-residential" buildings "back into homes."

Toward the end of the hearing, BZA members raised several issues requiring further input from the parties about the building's "floor area" and "rear loading dock"; FSMB's "plan or idea behind having 5 temporary employees beyond the 15 full-time" (raised after its application for special exception had been filed),[17] and FSMB's "articles of incorporation," "frequency of meetings," "smoking policy," plans for "after hours and weekends," and "overnight guests." The BZA therefore kept the record open and scheduled a second hearing for February 21, 2018.

---

[17] A representative from OP had reaffirmed the agency's approval of FSMB's application by emphasizing that OP's recommended conditions would limit the number of employees to fifteen and "the visitors and staff to foot traffic."

During the second public hearing, petitioners presented testimony from two neighbors living next to the Property, both of whom expressed concerns about "substantial adverse impact in regards to traffic," blocked driveways, and smoking. Petitioners also reemphasized their earlier arguments at the second hearing, stressing that FSMB does not "operate exclusively for charitable purposes," as allegedly required for nonprofit status under the zoning regulations governing special exceptions. They further insisted that the BZA should not rely exclusively on the engineering and architectural report of FSMB's expert, which calculated the Property's GFA to be 10,825 square feet and thus obviated the need for a variance. Petitioners instead urged the BZA to consider their architectural expert, whose calculation purportedly proved the GFA was below 10,000 square feet. They stressed that concern because FSMB's claimed exemption from an area variance "goes to the heart of whether [FSMB's] use is in harmony with the zoning requirements."[18] Petitioners' expert was made available for questions, but none was asked by the BZA.

---

[18] FSMB's initial application requested both a special exception to use the Property as an office for a nonprofit organization and an area variance from the GFA requirement of ten thousand square feet "or greater" under 11 DCMR U § 203.1(n)(2). However, according to FSMB, it engaged an engineering firm to provide a topographic survey, and the result showed that the Property has GFA greater than ten thousand square feet, prompting FSMB to amend its requests for zoning relief to eliminate an area variance.

At the close of the second hearing, the parties were requested to submit proposed findings of fact, conclusions of law, and "whatever conditions you do or don't agree on, after talking with the opposition."[19]

On April 18, 2018, after reviewing the requested submissions, the BZA granted FSMB's application "for a period of five years," subject to the following conditions (in addition to those imposed by the zoning regulations):[20] (1) A "maximum of eighteen people may work on site"; (2) FSMB may hold "a maximum of three committee meetings per quarter during business hours" limited to 25 invitees; (3) it may hold "an annual meeting or reception" with 50 invitees that must end by 8 p.m.; (4) "Staff and visitor parking will be in nearby garages only and on-street parking will not be allowed"; and (5) there cannot be "expansion of the existing building footprint[,] and other extrinsic alterations are subject to approval

---

[19] After the second hearing, OP submitted a supplemental report, on March 21, 2018, modifying earlier recommendations to say: (1) there must be no more than fifteen "people," rather than "employees," working at the Property; (2) FSMB may hold up to three committee meetings per quarter, hosting no more than fifteen invitees per meeting; and (3) FSMB may hold a "reception" for fifteen invitees every quarter, ending no later than 8 p.m.

[20] See *supra* note 9 and accompanying text.

by the D.C. Historic Preservation Office."[21] This timely petition for review followed.

## II. Standard of Review

### A.     General Rules

In reviewing a zoning action, we do not reassess the merits of a decision by the zoning authorities.[22] But we must "consider whether the findings made by the BZA are sufficiently detailed and comprehensive to permit meaningful judicial

---

[21] Other conditions (most of which were recommended by OP) require restriction of all deliveries to weekday office hours; loading is restricted to the alley; the premises will not be rented or otherwise used for an event by a third party; fundraisers are prohibited; and FSMB and ANC-2D will "establish a neighborhood liaison to provide a forum for concerns and provide information about [FSMB] activities to property owners within 200 feet of the [Property]." There also shall be "security lighting," a "24-hour emergency response service," "a dedicated space for at least three bicycles" in the building's basement or garage; there shall be no smoking on the premises; and FSMB shall "give notice and a copy of plans to the liaison, ANC, [the petitioners], the neighbors whose properties abut the site, and to Mr. Guinee" (a former petitioner).

[22] *See Washington Canoe Club v. District of Columbia Zoning Comm'n*, 889 A.2d 995, 998 (D.C. 2005).

review of its decision."[23] If they are, "[w]e will not reverse [the BZA's decision] unless its findings and conclusions are '[a]rbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;' in excess of its jurisdiction or authority; or '[u]nsupported by substantial evidence in the record of the proceedings before the Court.'" [24] Moreover, we accord "great weight" to the BZA's interpretation of the regulations that it is charged with enforcing, and that interpretation must be upheld "unless it is plainly erroneous or inconsistent with the regulations."[25]

## B. Heightened Level of Scrutiny?

Petitioners invite us to apply higher scrutiny to the BZA's Decision and Order than we do in usual zoning cases because, they say, the BZA's findings and conclusions "largely mirror" the proposed order submitted by FSMB. We decline

---

[23] *Draude v. District of Columbia Bd. of Zoning Adjustment*, 582 A.2d 949, 953 (D.C. 1990).

[24] *Economides v. District of Columbia Bd. of Zoning Adjustment*, 954 A.2d 427, 433 (D.C. 2008) (quoting D.C. Code § 2-510(a)(3) (2012 Repl.)).

[25] *St. Mary's Episcopal Church v. District of Columbia Zoning Comm'n*, 174 A.3d 260, 267 (D.C. 2017) (quoting *Metropole Condo. Ass'n v. District of Columbia Bd. of Zoning Adjustment*, 141 A.3d 1079, 1082 (D.C. 2016)).

the invitation. Although we have cautioned against verbatim adoption of findings and conclusions proposed by one of the parties before an agency,[26] we do not "prohibit the practice."[27] That said, more heightened scrutiny may apply to a BZA (or any other agency) decision when our review of the record shows that the decision, relying substantially on the language of a proposed order, "on its face, fails to consider relevant evidence and fails to adequately explain its findings."[28] Here, however, unlike our zoning decisions in *Durant* and *Metropole*, respectively, the BZA Decision and Order does not present "approximately 99.9% verbatim adoption of [FSMB's] proposed order" without addressing petitioners' objection;[29] nor does

---

[26] *Metropole Condo. Ass'n*, 141 A.3d at 1082 (remanding BZA decision granting variance and special exception because of virtual verbatim reliance on applicant's proposed order).

[27] *Id.* ("While ordinarily the verbatim adoption of the prevailing party's proposed order will not necessarily lead to reversal . . . ."); *Durant v. District of Columbia Zoning Comm'n*, 99 A.3d 253, 257-58 (D.C. 2014) (observing that courts or agencies, after careful review of a party's proposed findings of facts and conclusions of law, on occasion "might conclude[] that a better document could not have been prepared.") (internal quotation marks omitted).

[28] *Metropole Condo. Ass'n*, 141 A.3d at 1082.

[29] *Durant*, 99 A.3d at 257 (remanding Zoning Commission's approval of proposed planned unit development for inadequate findings and conclusions as to compliance with applicable regulations after noting (in dictum) "the Commission's essentially verbatim adoption, grammatical errors and all, of a proposed order drafted by the developer").

it "largely mirror[] [FSMB's] proposed findings and conclusions with only a few minor typographical changes."[30]

We do agree with petitioners that overreliance on verbatim submissions by a party for inclusion in a dispositive agency order may require heightened scrutiny of the agency decisional process, including its language. But, that concern must be folded into recognition that, in civil and agency proceedings, it is common – indeed, virtually routine – for the court or agency to require the parties to propose findings of fact and conclusions of law. These submissions usually offer significant help toward sharpening the decider's focus and expediting achievement of a sound result within a time frame that otherwise would likely be intolerable, given the caseloads in judicial and administrative proceedings. The case law supports our deferential, not "heightened," review here.

In *Watergate E. Comm. Against Hotel Conversion to Co-Op Apts. v. District of Columbia Zoning Comm'n*,[31] for example, we applied our usual, deferential standard of review to affirm the Zoning Commission's approval of a planned unit development, even though "the majority of the paragraphs" in the Commission's

---

[30] *Metropole Condo. Ass'n*, 141 A.3d at 1082.

[31] 953 A.2d 1036 (D.C. 2008).

findings and decision "were adopted verbatim from the applicant's proposals."[32] We observed that the Zoning Commission had "added sentences and phrases, changed sentence structure, referenced the applicable regulations, changed the grammar, and, in some places, added entirely new paragraphs."[33] Thus, we saw "no reason to doubt that the Commission's findings and decision represent[ed] its own considered conclusions."[34]

Similarly, here, in scrutinizing FSMB's proposed findings and conclusions, the BZA elucidated the issue of self-certification by citing a previous BZA decision on certification of the GFA requirement; added a reference to the letter from the new Colombian Ambassador; corrected the conditions to acknowledge OP recommendations; and added a new section to address petitioners' concern that the BZA had not accorded OP's report "great weight." We conclude, accordingly, that

---

[32] *Id.* at 1045.

[33] *Id.*

[34] *Id.*; *accord St. Mary's Episcopal Church*, 174 A.3d at 268 (in affirming Zoning Commission's grant of variance to allow demolition of existing structure and construction of new building, court relied on foregoing language in *Watergate East* opinion to reject challenge based on claim that Commission's order reflected "verbatim adoption of applicants' proposed findings and conclusions").

scrutiny of FSMB's submissions need not be more heightened than our deferential standard of review.

## III. Special Exception

### A.     FSMB As a Nonprofit Organization

The zoning regulations permit non-residential use of existing residential property by a "nonprofit organization"[35] in an R-3 zone, provided the user is granted a "special exception." [36]   Petitioners contend that FSMB, while concededly a § 501(c)(6) organization, is nonetheless a "lobbying" organization, *not* a "nonprofit organization" as defined in the zoning regulations,[37] and thus it is not eligible for a special exception.   They say, more specifically, that as a § 501(c)(6) "business league" – "organized" and "operated" for "the benefit of [its] members to promote the medical profession" – FSMB does not devote itself "exclusively" to benefiting

---

[35]  11 U DCMR § 203.1(n) ("Use of existing residential buildings and the land on which they are located by a nonprofit organization for the purposes of the nonprofit organization").

[36]  11 DCMR X § 901.2.

[37]  See *supra* note 5.

the public by pursuing a purpose specified in the zoning regulations that define a

"nonprofit organization," namely:

> An organization organized, registered with the appropriate
> authority of government, *and operated exclusively* for
> religious, charitable, literary, scientific, community, or
> educational purposes, or for the prevention of cruelty to
> children or animals; provided that no part of its net income
> inures to the benefit of any private shareholder or
> individual.[38]

Petitioners made this argument at the first BZA hearing, as noted earlier,

through their expert, Nancy Kuhn. She testified that the zoning regulations'

definition of a nonprofit organization is akin to, indeed manifestly drawn from, the

exemption for purposes specified in § 501(c)(3),[39] not from § 501(c)(6)[40] exemption

granted to FSMB. From this distinction, Ms. Kuhn drew two conclusions: (1) by

promoting the "business interests of the physicians," FSMB lacked a qualifying

purpose based on the language defining "nonprofit organization"; and, in any event,

(2) by promoting these business interests and receiving $40 million in revenue for

---

[38]    11 B DCMR § 100.2. (emphasis added); see text
accompanying *supra* notes 3-5.

[39]  See *supra* note 12.

[40]  See *supra* note 14.

its "testing services," FSMB violated the last clause of that definitional language precluding inurement of any net income "to the benefit of any private shareholder or individual."[41]

### 1. FSMB's "Purpose"

We address, first, FSMB's "purpose." No evidence has been presented indicating that, given the similarities, the zoning regulation defining "nonprofit organization" was actually premised on, and thus limited by, § 501(c)(3). Furthermore, perhaps recognizing that FSMB was "organized exclusively for scientific and educational purposes,"[42] Ms. Kuhn did not dispute that FSMB was "organized" for such tax-exempt purposes. She testified, however, that FSMB's function as a "lobbying" organization (when coupled with its revenue from testing services and examination fees), revealed that it is not "operated exclusively" for its announced "scientific and educational purposes," thus failing to qualify as a "nonprofit organization."[43]

---

[41] See text accompanying *supra* note 38.

[42] See *supra* note 2.

[43] See text accompanying *supra* note 38.

FSMB disputes that analysis. In addition to citing the specific purposes stated in its articles of incorporation,[44] FSMB called two witnesses at the first hearing to explain its activities in furtherance of those purposes. Its CEO, Dr. Humayun Chaudhry, and Senior Vice President for Legal Services, Eric Fish, both testified that: (1) FSMB is a federation of state governmental agencies;[45] (2) the mission is educational;[46] (3) public health is a major focus;[47] and (4) FSMB operates an "Advocacy Office" in the District of Columbia to further its mission.[48]

---

[44] See *supra* note 2.

[45] "Our members are the 70 state medical and osteopathic boards that carry out the duties of state government in the regulation of medicine. Our members therefore are members of government" (Fish); "Typically, board members of each state and territory are appointed by the governor." (Chaudhry).

[46] "[W]e develop licensing exams that are related to medical education and the ability of medical students to be licensed for full unrestricted practice of medicine," and FSMB hosts educational meetings for Board attorneys, as well as "webinars and round tables . . . open to the public in many cases" (Fish); "We have a work group looking at best practices to make sure that the state boards are streamlining their services," and "[w]e are also educating medical students, residents, and physicians as well as the public about medical regulation" (Chaudhry).

[47] FSMB helps the state boards "promote quality health care and protect the public" (Chaudhry); it "work[s] with our partners at the CDC, and the FDA" on "prescription drug monitoring programs" (Chaudhry); it partners "with the DEA to host multiple live conferences . . . to educate individual practitioners about opioid abuse" (Fish).

[48] The office was established "to allow for regular meetings with members of Congress and the administration" about "state-based regulation, licensure," or for creation of a "work group on regenerative and stem-cell therapies" at the request of a senator (Chaudhry).

Dr. Chaudhry and Mr. Fish both acknowledged that FSMB's "Advocacy Office" on the Property could be characterized as a lobbying operation, and thus was registered as such under a Senate disclosure rule. Contrary, however, to petitioners' tax expert, Ms. Kuhn, Mr. Fish pointed out that FSMB's "advocacy" – its lobbying – was but one percent of FSMB's total budget, and thus was not substantial enough to threaten its tax exemption even if it were a § 501(c)(3) organization.

Finally, Mr. Fish testified that, although FSMB was chartered as a scientific and educational nonprofit corporation, it also "carr[ies] out a charitable purpose," namely, to "help our members fulfill [the] goal" of assisting "the functions of government" and "lessening of the burdens of government," each of which "constitutes [a] charitable function under 501(c)(3) as well."

In sum, FSMB's witnesses maintained that, as a § 501(c)(6) organization, FSMB satisfied the criteria for a "nonprofit organization," entitled to apply for a special exception for the Property. But, they added, even if § 501(c)(3) criteria were

used to interpret the meaning of "nonprofit organization" [49] under the zoning regulations, FSMB would be eligible to apply for a special exception. [50]

## 2. Inurement of Net Income to Benefit Private Members

Petitioners further contend, based on Ms. Kuhn's testimony, that FSMB cannot qualify as a "nonprofit organization" because, contrary to the zoning regulation defining a "nonprofit organization," [51] a substantial portion of net revenue – derived from grossing $40 million from its "testing services" – inures to the benefit of every "member," the equivalent, she said, of profit to "a private shareholder or individual." She illustrated her point by arguing that, if FSMB were to "spend

---

[49] 11 B DCMR § 100.2.

[50] The BZA found that FSMB's annual lobbying budget for activities on Leroy Place, N.W. is around $400,000 of approximately a $40 million budget nationally, or only one percent of its total activity – a de minimis use of its budget overall. Thus, argues FSMB, even if it were limited to the constraints imposed on a § 501(c)(3) exempt organization, it does not believe that FSMB's advocacy would be "substantial in nature," destroying its tax-exempt status. *See Airlie Found. v. I.R.S.*, 283 F. Supp. 2d 58, 62-63 (D.D.C. 2003) ("operational test [of § 501(c)(3)] requires both that an organization engage 'primarily' in activities that accomplish its exempt purpose and that not more than an 'insubstantial part of its activities' further a non-exempt purpose" (citing Treas. Reg. (26 C.F.R.) § 1.501(c)(3)-1(c)(1)). We need not – and do not – opine on FSMB's alleged qualification under § 501(c)(3).

[51] See text accompanying *supra* note 35.

$400,000 on lobbying" (from its Advocacy Office on the Property), "that would actually dwarf the $170,000 of membership fees," thereby suggesting that, if the special exception were granted, the members would personally reap $230,000, in violation of the applicable zoning regulation.

Petitioners' premise here is fallacious. Ms. Kuhn based her testimony on the assumption that an FSMB "member is a private shareholder or individual." She later acknowledged, however, during the first hearing, that every FSMB "member" is a state medical board – a governmental entity – not a private individual. Her testimony therefore confused the actual benefits from FSMB membership – enhanced education and functioning of state medical boards – with the intangible reward an individual physician receives from test results generated by FSMB for a fee. That latter kind of benefit, akin to a medical school diploma, is far removed from a direct financial payback or "inurement" to a test-taker (or student) who pays for a service (or an education).

### 3. BZA Ruling

Based on the testimony and other evidence, the BZA was not impressed with petitioners' argument that, because FSMB is a lobbying organization, it is

disqualified from the requested special exception. Rather, the BZA concluded that FSMB not only is "organized for educational and scientific purposes"[52] but also is actually operated with two "primary missions" – "educational" *and* "charitable."[53] In so concluding, the BZA specified that FSMB's "regulation and improvement of the medical practice is undoubtedly a benefit to the public, as it lessens the burdens of government and certainly meets the definition of a charitable organization."[54] Therefore, the BZA rejected petitioners' fundamental premise that, to operate with a charitable purpose, "an applicant for relief under Subtitle U § 203.1(n) does not have to be exclusively organized and operated as a 501(c)(3)."[55] The BZA ruled accordingly that, based on its dual purposes, "educational and charitable," FSMB "qualifies as a nonprofit organization, as such term is defined under the Zoning Regulations."[56]

We must accord "great weight" to the BZA's interpretation of the zoning regulations, and uphold its interpretation unless "plainly erroneous or inconsistent

---

[52]  See *supra* note 2.

[53]  Decision and Order at 15.

[54]  *Id.* at 14.

[55]  *Id.*

[56]  *Id.* at 15.

with the regulations."[57]  We perceive no such error or inconsistency here and therefore must sustain the BZA's ruling that FSMB is a "nonprofit organization" qualified to apply for the special exception it seeks.

## B.       Effects on Use of Neighboring Properties

We turn to the merits. Petitioners claim BZA error regarding two "specific special exception requirements"[58] in finding that:  (1) FSMB's use of the Property will not "adversely affect the use of the neighboring properties,"[59] and further finding that (2) the "amount and arrangement of parking spaces" will "be adequate and located to minimize traffic impact on the adjacent neighborhood."[60]  Cutting across these specific requirements are issues of "undue adverse impact"[61] and

---

[57]  *St. Mary's Episcopal Church*, 174 A.3d at 267.

[58]  Decision and Order at 9.  As the BZA acknowledges, *id.* at 17, 21, the first "specific special exception" requirement quoted above is virtually the same as the second "general special exception" requirement, 11 DCMR X § 901.2. (b).  See text accompanying *supra* notes 7 and 8.

[59]  11 DCMR U § 203.1(n)(3).

[60]  11 DCMR U § 203.1(n)(4).

[61]  11-X-DCMR § 901.3.

insufficient mitigation "to protect adjacent or nearby property."[62] We consider first the anticipated effects on the "use of the neighboring properties."

## 1. Adverse Effects

As to the alleged adverse "effects" or "impact" on neighboring properties, the BZA concluded that petitioners' evidence did not "support the claim" that FSMB's use of the Property "would be more adverse" – "more intense" – than its previous use "as a chancery,"[63] which the Colombian government had operated until October 2015.[64] Petitioners offered sworn testimony claiming such intensified impact, based on "observations by neighbors" that a "large exodus" of chancery personnel had begun in 2007, leaving a "skeleton staff" in 2014.[65] To the contrary, FSMB "provided evidence of events held [by the Colombian Government] at the Property, including visits from senior government officials and press conferences, as recently as 2014."[66] Furthermore, a letter from the Colombian Ambassador stated that the

---

[62] 11-X-DCMR § 901.4.

[63] Decision and Order at 23.

[64] *Id.* at 22.

[65] *Id.* at 23.

[66] *Id.*

"Government of Colombia used the property as a functional Embassy with approximately 25-40 full time diplomats, administrative assistants and military personnel" until 2015. Significantly, added the BZA, the Colombian government did so without "any conditions or limits placed on its use."[67] Petitioners objected to any reliance on the Ambassador's letter because he was not appointed until 2017 and therefore "had no personal knowledge of the number of employees at the Chancery in October 2015." It is not obvious, however, that an Ambassador, submitting a letter for an official proceeding, would not have access to such information for that letter about his former chancery, and petitioners proffered no contrary evidence. We therefore must agree, as FSMB puts it, that the BZA could accord the Ambassador's letter "a modicum of deference, especially as it relates to prior government use."

Importantly as well, although the BZA "believ[ed] the testimony and observations from neighbors were genuine" – meaning, we think, were offered in good faith – the BZA ultimately rejected the neighbors' observations that the chancery had been "vacant for over a decade."[68] It concluded, based on all the evidence – the Ambassador's letter showing 25-40 employees until 2015 and the

---

[67] *Id.* at 24.

[68] *Id.*

chancery events through 2014, as well as the neighbors' observations to the contrary – that it was "possible" the chancery had "operated with moderate-heavy office use without much impact on the community."[69]

Ultimately, therefore, the BZA concluded that the record did not "support the claim that use by the FSMB would be more adverse" to neighboring properties "than the use of the property as a chancellery."[70]

## 2. Mitigating Conditions

The BZA reached the foregoing conclusion, in part, by elaborating conditions that mitigated the adverse impact on the neighborhood. It observed that FSMB, with "only 70 members" nationally, is proposing an "extremely limited," not "intense" office use.[71] Unlike the chancery use, moreover, the BZA found that FSMB will be reducing adverse impact on the neighborhood through compliance with numerous conditions that limit the number of people working on site, the number of committee meetings and participants there per quarter, and the number of invitees to an annual

---

[69] *Id.*

[70] *Id.* at 23.

[71] *Id.* at 24.

reception on the Property (ending no later than 8 p.m.). Also, employee and visitor parking on Leroy Place, N.W. will be forbidden, and sundry other limitations will be imposed governing visitors, weekend guests, and deliveries; adding security lighting; and establishing a liaison with Advisory Neighborhood Commission ("ANC") 2-D.[72]

Petitioners nonetheless argue for reversal by alleging that, as to the mitigating conditions, the BZA failed to give the required "great weight" to OP's recommendations,[73] and erred in particular by failing to explain why it "increased [the] number of people permitted on site and at events" over the numbers OP had proposed.

We therefore turn to the facts (which challenge easy reading). In its report, OP recommended that the BZA grant the special exception, subject to "adequate operational controls and mitigation measures"[74] to reduce adverse effects on the neighborhood from activities on the Property. To that end, OP recommended

---

[72] See *supra* note 19 and accompanying text.

[73] D.C. Code § 6-623.04 (2018 Repl.) (requiring the BZA to give "great weight to the recommendation of the Office of Planning").

[74] Decision and Order at 21.

(among other conditions): permitting a "maximum of 15 people" to "work on site"; limiting FSMB to "three (3) committee meetings per quarter during business hours," attended by not more than "15 invitees per meeting" (one of which per quarter "may include a reception . . . that will end by 8 p.m."); and requiring "[a]nnual meeting[s] and events" to be "held off site."[75]

The BZA "carefully considered the OP report" and found "its recommendation to grant the application persuasive."[76] That said, with a decision falling in between the FSMB and OP proposals,[77] the BZA did not accept in full the specific conditions limiting OP's approval. Rather, the BZA approved: (1)] a "maximum of 18 [not OP's 15] people [to] work on site";[78] and (2) a "maximum of three committee meetings per quarter," limited to "25 [not OP's 15] invitees per

---

[75] In its Pre-Hearing Statement in Support of Special Exception Relief, FSMB proposed to limit: (1) its staff on the Property to 15 to 25, and (2) its on-site receptions to "once a quarter," not to exceed 50 guests, ending "by 8:00 p.m." At the first public hearing, FSMB added a request for "two to three meetings a quarter," with average attendance of "8 to 15." At the second hearing, FSMB upped the likely average number of attendees for those committee meetings to "about 15 to 20." By the time of proposing its findings of facts and conclusions of law, however, FSMB had asked to add more attendees to those meetings: "a maximum of three (3) committee meetings per quarter, not to exceed more than 25 invitees per meeting."

[76] Decision and Order at 26.

[77] See *supra* note 75.

[78] Decision and Order at 26.

meeting"; then added (3) a "maximum of one reception per *year*"[79] (not one per *quarter*), to be "held the night before a committee meeting," restricted to 50 guests and ending "by 8:00 p.m." (not the 15-guest limitation recommended by OP for a quarterly reception).[80] BZA also (4) required (as FSMB and OP agreed) that "[a]nnual meeting[s] and events shall be held off site"[81] (presumably, though not definitively, excluding the annual reception on the night before a committee meeting).

In sum, after considering the reduced on-site activity recommended by OP, the BZA did not go that far. To OP's proposed limitations, the BZA: [1] added three potential staff members, [2] added ten more attendees at each committee meeting (three per quarter), and [3] added 35 more guests (totaling 50) for an annual reception, in contrast with the 15-maximum number of guests that OP had recommended for quarterly receptions (which the BZA altogether rejected).

---

[79] Decision and Order at 27. We italicize "year" because, as the parties agree, the Decision and Order at 27 mistakenly said "maximum of one 50-guest reception per quarter" when the vote actually approved one such reception per year – a correction we assume the BZA will make.

[80] *Id.*

[81] *Id.*

### 3.    "Great Weight"

In response to the BZA's modifications of OP's recommendations, petitioners argue that the BZA was required to make "a finding of fact on each material contested issue of fact";[82] that the permissible levels of people and events on the Property if a special exception was granted are a material contested issue; that OP's recommendations in this regard must be accorded "great weight";[83] and that the BZA failed to make the findings necessary to justify its departures from OP's recommendations.  We agree with petitioners that, on this record, the contested levels of people and events on the Property collectively present a material issue that requires sufficient findings supported by substantial evidence.  That brings us to the "great weight" statute.[84]

The BZA ultimately found (essentially a conclusion of law) that, "with adequate controls and conditions, the limited office use proposed – of up to 20 [reduced to 18] employees who walk to the office, and a handful of meetings – would

---

[82]  *Gilmartin v. District of Columbia Bd. of Zoning Adjustment*, 579 A.2d 1164, 1167 (D.C. 1990).

[83]  D.C. Code § 6-623.04; see text accompanying *supra* note 73.

[84]  See *supra* notes 73 and 83.

not adversely affect the use of neighboring properties."[85]  The issue, then, is whether, in reaching that quite general conclusion, the BZA gave the required "great weight" to OP's three specific recommendations at issue here.

Petitioners do not dispute that the BZA accepted OP's recommendations that the number of people working on site and attending committee meetings must be reduced below the levels requested by FSMB.[86]  Nor do they dispute that the BZA moved considerably toward OP in capping the number of people on site during business hours:  18 rather than the 25 sought by FSMB (though three higher than the 15 daily level recommended by OP).   Nonetheless, [1] the staffing level was vigorously contested, as were [2] BZA's approvals of  25 attendees at committee meetings during business hours (compared to OP's suggested 15), and [3] BZA's approvals of 50 attendees at an annual reception (rather than OP's recommended quarterly receptions limited to 15 guests).[87]  Therefore, in addressing the "great weight" issue, we will determine whether the BZA must reappraise those three differences and, if so, the extent to which the BZA must document its reasoning.

---

[85]  Decision and Order at 24.

[86]  See *supra* note 75.

[87]  FSMB withdrew its initial request for quarterly receptions, approved by OP, perhaps (though we do not know) in the hope of gaining BZA permission for the annual 50-guest reception, which it received.

This court first reviewed a "great weight" requirement to determine the level – and required articulation – of the deference owed to an ANC recommendation in an Alcohol Beverage Control Board proceeding. [88] Since then, this court has routinely applied the "great weight" analysis to ANC "issues and concerns" in BZA proceedings as well. [89] Eventually, a "great weight" requirement was added to the Office of Zoning Independence Act of 1990, requiring the BZA "to give great weight to OP recommendations." [90] In fact, even before the "great weight" requirement was incorporated into the zoning legislation, this court had said that the BZA "is required to demonstrate in its findings that it considered OP's views, and must provide *a reasoned basis* for any disagreement with them." [91] In coming to that conclusion, we

---

[88] *Kopff v. District of Columbia Alcoholic Beverage Control Bd.*, 381 A.2d 1372, 1384 (D.C. 1977).

[89] *See, e.g.*, *Kalorama Citizens Ass'n v. District of Columbia Bd. of Zoning Adjustment*, 934 A.2d 393, 407-09 (D.C. 2007); *Glenbrook Rd. Assn. v. District of Columbia Bd. of Zoning Adjustment*, 605 A.2d 22, 34 (D.C. 1992); *Levy v. District of Columbia Bd. of Zoning Adjustment*, 570 A.2d 739, 746 (D.C. 1990); *Wheeler v. District of Columbia Bd. of Zoning Adjustment*, 395 A.2d 85, 89-91 (D.C. 1978).

[90] Decision and Order at 26; *see* D.C. Code § 6-623.04 (". . . The Office of Planning shall review and comment upon all zoning cases, and the Zoning Commission and the Board of Zoning Adjustment shall give great weight to the recommendation of the Office of Planning. . . .").

[91] *Glenbrook Rd. Ass'n*, 605 A.2d at 34 (emphasis added).

drew upon *Kopff* [92] (addressing ANC concerns) for interpretation of the BZA's obligation to "give great weight" to OP recommendations. [93]

Here, we conclude that, in its Decision and Order, "[t]he BZA should have explicitly acknowledged and addressed OP's reservations."[94] In other words, we agree with petitioners' contention that, in making the three material changes from OP's positions, the BZA's Decision and Order did not articulate a "reasoned basis" for the disagreements,[95] let alone "elaborate, with precision, its responses to the [OP's] issues and concerns"[96] that nonetheless led to the BZA's higher numbers. More specifically, the BZA Decision and Order itself did not address the disparity between its permitted "18 people" working in the Property and OP's recommended

---

[92] 381 A.2d at 1384 ("[A]n agency must elaborate, with precision, its response to the ANC issues and concerns. . . . That is, the agency must articulate why the particular ANC itself, given its vantage point, does or does not offer persuasive advice under the circumstances. . . . [W]e believe that 'great weight' implies explicit reference to each ANC issue and concern as such, as well as specific findings and conclusions with respect to each.").

[93] See *Glenbrook Rd. Ass'n*, 605 A.2d at 35.

[94] *Id.*

[95] *Id.*

[96] *Id.* (quoting *Kopff*, 381 A.2d at 1384).

limitation of the number to 15.[97]  Nor did that final ruling discuss BZA's permission for FSMB to hold an annual reception with 50 guests, as compared with OP's willingness to approve three quarterly receptions if limited to 15 guests[98] (implying that OP's principal concern was the number of attendees at any reception).[99]  Finally,

---

[97]  At the final public meeting on April 18, 2018, BZA members observed that, initially, FSMB had proposed a staffing level on the property limited to 15 but, over time, had come to request 25 employees.  See *supra* note 75. The Chairperson initially favored 15 employees because FSMB had "once said 15 was appropriate." Another member, saying that the "difference between 15 and 20 isn't that significant," was "quite comfortable" with a "limit of 20," acknowledging that it would be too "challenging" to limit five of the employees to "temporary" ones, as FSMB apparently had proposed in an effort to reach at least 20.  Another member, who "could go either way because the building is so large," further observed that "OP also weighed in and recommended the 15 number.  So I was kind of stuck on 15[,] but I'll see what my other fellow Board members have to say about it."  Still another member, without "a strong feeling on 15 or 20," picked 20.  The Chairperson replied, "[W]e're splitting hairs"; acknowledged his belief that FSMB would "live with 15" and "do the project"; then added, "I don't mind 18" – after which, with apparent agreement on 18, the discussion moved on.

[98]  The Decision and Order, at 27, actually approved one reception per quarter with up to 50 guests, which the parties agree was a mistake that would be "mended" to authorize only one, annual, 50-guest reception.  See *supra* note 79.

[99]  Also at the final public meeting on April 18, 2018, BZA members paid considerable attention to "the receptions and the meetings," eventually appearing to settle for an annual FSMB reception on the Property with 50 guests as less adverse in its impact on the neighborhood than the quarterly receptions limited to 15 guests recommended by OP – a choice described by one BZA member as a "splitting hair type of situation."  Of particular concern as well were "traffic impacts" along a "narrow one-way street with the valet parking and all that."  Then, once the BZA members rejected OP's proposed quarterly receptions limited to 15 guests, they moved on to consider the number attending committee meetings and expressly jumped, without explanation, to change "the OP condition" from "15 to 25."  Also

BZA's Decision and Order omitted discussion of its condition limiting committee meetings to 25 participants rather than OP's recommended 15.

The BZA concluded, overall, that petitioners had "provided no evidence" that FSMB's proposed use "would be more adverse than the [previous] use of the property as a chancellery,"[100] the fundamental comparison critical to approval of the special exception. The BZA reached that conclusion (as noted earlier) because of the "adequate controls and conditions" imposed: "up to 20 [reduced to 18] employees who walk to the office, and a handful of meetings."[101] In reaching that generalized conclusion, the BZA gave no "reasoned basis"[102] for rejecting OP's recommendations, directed at assuring that FSMB's use of the Property would "not adversely affect the use of the neighboring properties."[103] In failing to "elaborate, with precision, its response to the [OP's] issues and concerns"[104] about the number

---

without explanation, they accepted FSMB's proposal for an annual reception on site "with 50 people."

[100] *Id.* at 23.

[101] *Id.* at 24.

[102] *Glenbrook Rd. Ass'n*, 605 A.2d at 35.

[103] 11-U DCMR § 203.1(n)(3); *see* 11-X DCMR § 901.2(b) ("Will not tend to affect adversely, the use of neighboring property . . . .").

[104] *Glenbrook Rd. Ass'n*, 605 A.2d at 35 (quoting *Kopff*, 381 A.2d at 1384).

of employees and the sizes of meetings and receptions on the Property, the BZA failed to accord OP's recommendations the "great weight" required by statute.

### 4. Harmless Error?

There remains, however, the question whether the BZA's erroneous failure to "give great weight" in its decisional analysis to OP's recommendations is harmless, in light of (1) the members' discussions at the end of the public hearings and to (2) all the other express conditions imposed on the special exception beyond those limiting staff, hours of operation, meetings, and receptions on the Property.[105] We believe not.

As to the *first*, BZA discussion-based argument, it is clear that the BZA addressed in detail petitioners' issues and concerns about the effects on the neighborhood of various levels proposed for staffing the Property, committee meetings, and receptions.[106] Moreover, the BZA members were aware of OP's recommendation as to each. On the other hand, aside from the special concern for not burdening the neighborhood with many, bothersome receptions, the BZA

---

[105] See text accompanying *supra* notes 9 and 21.

[106] See *supra* notes 97 and 99.

discussions of these matters appeared to perceive immaterial – "splitting hair" – differences between OP and the BZA. We do not say that the BZA abused its discretion in choosing the options it selected. We do say, however, that even – or perhaps especially – when the decision becomes a virtual coin flip, the members' reasoning that culminates in the final, written decision must reflect "great weight" given to OP's issues and concerns. The BZA's final discussions reflected the members' thinking – their reasoning back and forth – from which one might distill various levels of attention to OP recommendations. But, until the decision is written, we cannot be sure that the required "great weight" has been figured in.

*Second*, it is true that several other conditions imposed by the BZA's Decision and Order offer a level of protection to the neighborhood comparable in importance to those that concerned OP – for example, the conditions prohibiting staff and visitor parking on LeRoy Place, N.W. during business hours, or on evenings,[107] as well as those preventing rentals and fundraisers on the Property.[108] These other significant

---

[107] See text accompanying *supra* note 21.

[108] See *supra* note 21.

conditions, however, when combined with the other, lesser conditions imposed,[109] do not significantly dilute the impacts from allegedly excessive activity on the Property. Thus, the differences between OP's recommendations and the BZA's conditions are not inconsequential; the BZA's failure to "give great weight" to OP's recommendations cannot be called harmless error. [110]

### 5. Remand

We therefore must remand the case for the BZA to address these matters with the required specificity. In remanding, however, we are not reversing the grant of a special exception for the Property. The BZA's Decision and Order was based, in part, on personnel and attendance levels greater than OP would have allowed; thus,

---

[109] We refer here to conditions governing loading, deliveries, security lighting, bicycles, liaison with ANC 2-D, and smoking. See *supra* note 21 and accompanying text.

[110] On one occasion we held harmless the BZA's failure to give great weight to OP's "expressed reservations regarding the placement of the new law school" at American University. *See Glenbrook Rd. Ass'n*, 605 A.2d at 34, 36. We did so, however, not because OP's reservations were insignificant but, rather, because the BZA "sufficiently addressed ANC 3-E's concerns, [which] largely adopted OP's objections." *Id.* at 36.

there is no reason to believe that adoption of OP's lesser levels would necessarily change the present outcome, absent some other reason for reversal.[111]

### C. Adequacy of Amount and Arrangement of Parking Spaces

Petitioners challenge the BZA's finding that the "amount and arrangement of parking spaces is adequate and located to minimize traffic impact on the adjacent

---

[111] Petitioners also claim BZA error "in concluding no adverse impacts in residential home prices and removal of the [P]roperty from residential use." As to *neighborhood home prices*, the BZA found that the testimony was conflicting, and thus inconclusive, between witnesses who anticipated increased tax assessments and those who foresaw decreasing residential values attributable to a special exception for FSMB. Decision and Order at 25. As to the alleged adverse impact on the *residential nature of the neighborhood*, petitioners rely primarily on testimony from their land use expert, Ellen McCarthy, who testified rather speculatively that "the major adverse impact" on the neighborhood from FSMB's special exception would be "destabilizing of the residential real estate market," putting a "quick stop" to a recent trend in the area toward restoring "formerly non-residential" buildings "back into homes." The BZA found, however, that other evidence proffered by petitioners themselves showed that the Property "can be easily converted back to residential" use – indeed, that "at least a dozen properties that were previously non-residential were converted back to residential use." *Id.* Accordingly, the BZA found that "there is no evidence to prove" (meaning the evidence was insufficient to prove) that this Property "will be permanently removed from residential use." *Id.* In sum, the BZA ultimately concluded that the "alleged concerns related to property values and the residential market are general and do not adversely affect the use of neighboring properties as residential properties." *Id.* These findings and conclusions are supported by substantial evidence and the law.

neighborhood," [112] in satisfaction of the fourth enumerated "specific special exception" requirement. [113] We cannot agree with petitioners; substantial evidence supports that ultimate finding (a conclusion of law), [114] which is far from arbitrary, capricious, an abuse of discretion, or otherwise unlawful. As noted above in part I(C), a condition on the proposed special exception bars anyone associated with FSMB, staff or visitor, from parking on Leroy Street, N.W. Moreover, the BZA found that the Property is located "about 500 feet from Connecticut Avenue bus stops, .4 miles from Massachusetts Avenue bus stops, and .4 miles from the DuPont Circle Metro entrance." [115] There is also "a public parking garage about .2 miles from the Property," and "the Washington Hilton garage is .1 miles" away. [116] Petitioners downplay those conveniences, expressing concern about "traffic back-ups" from delivery trucks, taxis, and other ride-sharing vehicles on narrow, one-way Leroy Place, N.W. and its alley – concerns anticipating "larger meetings" and "nighttime events" on the Property. These concerns, however, overlook the express

---

[112] Decision and Order at 17.

[113] 11 DCMR U § 203.1(n) (4).

[114] *Citizens Ass'n of Georgetown, Inc. v. District of Columbia Zoning Comm'n*, 402 A.2d 36, 42 (D.C. 1979).

[115] Decision and Order at 17.

[116] *Id.*

conditions on the special exception that would permit no more than quarterly committee meetings of up to 25 participants, limited to business hours, and only one annual meeting or reception restricted to 50 participants and ending no later than 8 p.m. There is no evidence of sustained, large-scale arrivals and departures at the Property. Furthermore, reports from OP and DOT support the BZA's finding that "the amount and arrangement of parking will have minimal traffic impact on the adjacent neighborhood," as the "proposed nonprofit office use is a use that is inherently quiet and generates little traffic."[117] That finding is buttressed by the further finding that "many office employees currently utilize public transportation" and, if driving, "will be directed to park in [the nearby] parking garages."[118] It is true, as petitioners point out, that in supporting its finding that FSMB generates "little traffic," the BZA mentioned, among the other reasons, that FSMB has "only eight full-time employees"[119] whereas the condition limiting the number of employees permits up to eighteen. That potential increase, however, is insufficient

---

[117] *Id.*

[118] *Id.*

[119] *Id.*

to undermine the BZA's reliance on substantial evidence that, given the aforementioned safeguards, "specific special exception" number 4 is satisfied.[120]

### D. Variance re Gross Floor Area

To satisfy "specific special exception" requirement number 2, the "gross floor area of the building in question, not including other buildings on the lot, [must be] ten thousand square feet (10,000 sq. ft.) or greater."[121] FSMB's initial application requested not only a special exception but also an area variance from the GFA requirement. FSMB later discovered, however, that it had omitted, partially, the GFA of the lower level from its calculation. It submitted the revised calculation to the BZA, "certifying"[122] the GFA at 10,825 square feet, supported by a letter and topographic survey from an engineering firm. At the first public hearing, a

---

[120] 11 DCMR U § 203.1(n) (4); see *supra* note 18.

[121] 11 DCMR U § 203.1(n) (2).

[122] In its Decision and Order at 9, the BZA observed that "[c]ontrary to FSMB's contention, proof that . . . the minimum GFA exists cannot be self-certified. Self-certification is only that the relief is needed, not that the Applicant and the property fall within the requirements for the relief to be granted." See 11 DCMR Y § 300.6(b)(3) (a certified architect certifies that "the relief requested is required in order for the proposed structure to be erected or the proposed use to be established.").

representative from OP testified that the GFA requirement for a special exception had been met, obviating any need for an area variance.

Petitioners challenged that testimony by submitting, prior to the second public hearing, its own expert's architectural report which concluded that the building has only 9,002 GFA. They also noted that, in light of the conflicting analyses, an expert of their choosing should have been permitted to measure the house – particularly the lower level area contested by petitioners' expert. The BZA rebuffed petitioners' challenge on three grounds: *First*, the BZA gave credence to the OP assessment that the Property satisfied the GFA requirement. *Second*, the BZA relied on evidence submitted by petitioners themselves. In order to show how many residences in the Sheridan-Kalorama Historic District could apply for special exceptions for non-residential use if FSMB's application were granted – triggering a trend that could further affect the area adversely – petitioners proffered a list of residential properties exceeding 10,000 square feet, compiled by searching the so-called "PIVS system." The BZA found 2118 Leroy Place, N.W. among those properties, reinforcing FSMB's claim to a variance exception.[123] *Finally*, the BZA observed – without

---

[123] Decision and Order at 16.

contradiction – that the Zoning Administrator ("ZA"), an officer of DCRA,[124] would have the final say on the GFA issue (including the related building permit), subject to petitioners' right "to challenge the eventual GFA determination."[125] Concluded the BZA: "[I]t is certainly plausible that the Zoning Administrator would find that the Building has a Gross Floor Area in excess of the 10,000 square foot GFA requirement," and thus "it is appropriate for [BZA] to accept the Applicant's self-certification."[126]

Absent any legal challenge by petitioners at the agency level contending that the ZA had to definitively validate the Property's 10,000 square foot (or greater)

---

[124] "The Zoning Administrator is an officer of DCRA, *see* 11 DCMR § 199.1, who reviews zoning issues presented by building permit applications." *Kalorama Citizens Ass'n*, 934 A.2d at 396 n.5.

[125] Decision and Order at 16.

[126] *Id.* The BZA's statement here – that it was "appropriate . . . to accept [FSMB's] self-certification" – appears at odds with its earlier statement on page 9 of the Decision and Order that self-certification means only that relief from a variance "is needed." Nonetheless, given everyone's agreement that the ZA must be satisfied before the BZA can definitively approve a special exception without a variance, we perceive no meaningful inconsistency in the BZA's granting conditional, rather than definitive, approval of FSMB's application for special exception – as occurred here, when the BZA clearly stated that, in "accepting Applicant's self-certification" it was "defer[ring] to the eventual determination of the Zoning Administrator on this point." *Id.* at 16.

GFA before ruling on the application for special exception,[127] the BZA accepted FSMB's proffered compliance as prima facie evidence of compliance ("it is certainly plausible"), subject to the ZA's confirmation as a condition subsequent.[128]

## IV. Conclusion

Based on a thorough review of the record, including the BZA's 27-page Decision and Order, the parties' briefs, and the entire transcripts and record, including exhibits, from the two public hearings before the BZA, and after applying the standards for reviewing a BZA proceeding, we remand the case for further proceedings for the BZA to give "great weight," consistent with this opinion, to the recommendations of the Office of Planning with respect to FSMB's staffing, meetings, and receptions.

*So ordered.*

---

[127] At the first public hearing, petitioners' only complaint about the role of the ZA was the allegedly slow response of DCRA (where the ZA was an officer) in zoning matters. See *supra* note 122.

[128] See *supra* note 124 and accompanying text.